Heather WALLACE, a minor, by her mother and next friend, Phyllis WALLACE, Plaintiff–Appellant,

v.

The BATAVIA SCHOOL DISTRICT 101, a municipal corporation, and James Cliffe, Defendants–Appellees.

No. 94–3943.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1995.

Decided Oct. 19, 1995.

Leonard J. Wojtecki (argued) and Scott Courtin, Truemper, Hollingsworth, Wojecki, Courtin & Ruddy, Aurora, IL, for Plaintiff–Appellant.

Peter K. Wilson, Jr., Bernard K. Weiler, Gary K. Mickey (argued), and Steven A. Andersson, Mickey, Wilson, Weiler & Renzi, Aurora, IL, for Defendants–Appellees.

Before KANNE and ROVNER, Circuit Judges, and SHABAZ, District Judge.*

KANNE, Circuit Judge.

This case affords a view of an unfortunately common situation faced by teachers in many public schools today. The incident occurred in a suburban community west of Chicago in Kane County, Illinois. The undisputed facts are as follows.

When business teacher James Cliffe returned to his Batavia High School classroom after a few minutes' absence, two sixteen-year-old female students, Heather Wallace and Kim Fairbanks, were facing each other screaming and calling each other "fucking bitches." Cliffe ordered both girls to take their seats and be quiet. That tactic didn't work. Wallace sat down but stood up again when Fairbanks approached her yelling, "I'm going to kick your ass right here and now." Cliffe again told both students to sit down. Wallace did so, but Fairbanks attempted to take a swing at Wallace. Cliffe stepped between the two girls. While facing Fairbanks, Cliffe told Wallace to get her books and leave the classroom.

Wallace gathered up her books and began to walk out of the classroom—slowly. Cliffe reached over another student's desk and took Wallace by her left wrist to speed her exit. As Cliffe pulled Wallace, she bent over the desk. Cliffe told Wallace to hurry up and grasped her right elbow to move her out of the classroom. Wallace stopped her movement toward the door and told Cliffe to let go. When Cliffe released his hold on Wallace, she walked out of the classroom and slammed the door. A fight indeed did occur later in the day. Both girls were suspended from the school for three days.

## PROCEEDINGS BELOW

Wallace claims the contact with Cliffe caused injury to her elbow. Through her mother, she sued Cliffe and the Batavia School Corporation under 42 U.S.C. § 1983, alleging violations of her Fourth Amendment right against unreasonable seizures and her Fourteenth Amendment right to substantive due process. The district court granted defendants' motion for summary judgment, and Wallace appeals that ruling.

## STANDARD OF REVIEW

We review grants of summary judgment *de novo*. *Cornfield by Lewis v. School Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir.1993). "The non-moving party cannot rest on the pleadings alone, but must identify specific facts to establish that there is a genuine triable issue." *Id.* Wallace

* The Honorable John C. Shabaz, District Court Judge for the Western District of Wisconsin, sitting by designation.

must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). She must show that there is more than merely metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If we do not find evidence sufficient to sustain a jury verdict in favor of Wallace, we will affirm the district court's grant of summary judgment. *Cornfield*, 991 F.2d at 1320; *see Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir.1989) (finding summary judgment appropriate where court concluded that facts taken in light most favorable to nonmovant did not amount to unreasonable seizure in school).

## ANALYSIS

### Fourth Amendment in the School Context

Wallace theorizes that Cliffe violated her Fourth Amendment right to be free from unreasonable seizures when he grabbed her elbow and wrist. The Fourth Amendment, which protects individuals' liberty and privacy interests, principally applies in the context of law enforcement, preventing police from searching private areas without a warrant absent exigent circumstances and from seizing suspected criminals unreasonably. *See Ingraham v. Wright*, 430 U.S. 651, 673 n. 42, 97 S.Ct. 1401, 1414 n. 42, 51 L.Ed.2d 711 (1977) (noting "[t]he principal concern of the Fourth Amendment's prohibition against unreasonable searches and seizures is with intrusions on privacy in the course of criminal investigations").

The Supreme Court, however, has applied the Fourth Amendment's protection to searches of students by school administrators at public schools. *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). *T.L.O.* instructs that teachers and administrators must respect students' privacy interests, but that they may search students where it is reasonable to do so under the circumstances, a lower threshold of suspicion than is generally applicable to police work. *Id.* at 341, 105 S.Ct. at 742.

The Court crafted its decision in *T.L.O.* around the role public schools play in furthering "publicly mandated educational and disciplinary policies." *Id.* at 336, 105 S.Ct. at 740. The Court also recognized that "the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *Id.* at 339, 105 S.Ct. at 741.

Immediate, effective action is sometimes needed to deal with the frequent occurrence of events that call for discipline. *Id.* The diminished protection of the Fourth Amendment for public schoolchildren is proper, the Court reasoned in *T.L.O.*, because classroom discipline and school order are crucial to effective education, and, moreover, the infusion of schools with drugs and the related escalation of violence make order and discipline all the harder to maintain. *Id.* at 339, 105 S.Ct. at 741.[1]

Although *T.L.O.* dealt only with searches, several circuit courts have relied upon it to find that seizures of students by teachers also come within the ambit of the Fourth Amendment. In *Edwards*, the Tenth Circuit applied the Fourth Amendment to the physical seizure of a student, then added that what was reasonable was informed by the school environment. 883 F.2d at 884. And the Fifth Circuit recently concluded that the Fourth Amendment's prohibition against unreasonable seizures protects students from improper disciplinary actions of public school officials. *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075 (5th Cir.1995). Again, the reasonableness of the teacher's actions was examined in light of the special relationship between teachers and students. *Id.*

---

1. In this same vein, the Supreme Court has affirmed limitations on students' freedom of speech. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (concluding that, although the First Amendment protected wearing a jacket saying "fuck the draft," *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), it did not protect the right of a fifteen-year-old high school student to wear the same message to school because it would disrupt the school's educational efforts).

The defendants urge us to reject this line of interpretation and to find that there can be no Fourth Amendment violation in this case. The rationale explained in *United States v. Attson*, 900 F.2d 1427 (9th Cir.), *cert. denied*, 498 U.S. 961, 111 S.Ct. 393, 112 L.Ed.2d 403 (1990) defendants argue, shields public school officials from the application of the Fourth Amendment unless the school officials act in conjunction with law enforcement agents with the purpose of enforcing the law.

■ The general *Attson* rule is that non-law enforcement government actors come within the purview of the Fourth Amendment only when their searches or seizures of individuals have no other purpose but to aid the government's investigatory or administrative functions.[2] *Id.* That test, applied with regard to a seizure, defendants claim, places Cliffe's conduct outside the purview of the Fourth Amendment because Cliffe was not acting on behalf of the police.

*Attson* observed, however, that *T.L.O.* had extended the scope of the Fourth Amendment's search protection to schools in light of the investigatory and administrative nature of school searches. *Id.* at 1432. *T.L.O.* noted that school searches retain their investigatory and administrative nature even if they are designed only to yield evidence of violations of school rules and not of criminal laws. 469 U.S. at 334–35, 105 S.Ct. at 738–39.

Here, the defendants do not dispute that Cliffe ordered Wallace out of the classroom and grabbed her in order to prevent a fight and restore order and discipline. This action of classroom control can be characterized as an administrative function designed to effectuate school policies and standards. Specifically, Batavia School District #101 policy forbids corporal punishment but allows teachers to restrain students physically in order to protect the students, others, or property from physical harm. Under these circumstances, we conclude that *Attson* does not provide an avenue around *T.L.O.*; its rationale does not shield the defendants from the application of the Fourth Amendment.

Nevertheless, while in school or under the supervision of school authorities, public school students are in a unique constitutional position enjoying less than the full constitutional liberty protection afforded those persons not in school. We know that students do not completely surrender their constitutional rights at the schoolhouse gate, *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), but "the nature of those rights is what is appropriate for children in school." *Vernonia School Dist. 47J v. Acton*, — U.S. —, —, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995).

With regard to students' liberty rights under the Fourth Amendment, we are presented with the basic concept that the law compels students to attend school, which deprives them of a level of freedom of mobility. Once under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators. "Unemancipated minors lack some of the most fundamental rights of self-determination—including even the right to come and go at will." *Id.* at —, 115 S.Ct. at 2391.

Wallace was not free to roam the halls or to remain in Cliffe's classroom as long as she pleased, even if she behaved herself. She was deprived of liberty to some degree from the moment she entered school, and no one could suggest a constitutional infringement based on that basic deprivation. And if, as the Supreme Court recognized in *T.L.O.*, discipline is crucial to education and education, as Epictetus wrote in the DISCOURSES, is necessary for freedom, depriving students of some liberty is linked to the ultimate liberation of the student. Moreover, flexibility in discipline is necessary to preserve the informality of the student-teacher relationship. *T.L.O.*, 469 U.S. at 340, 105 S.Ct. at 742.

The reasonableness of a Fourth Amendment seizure of a public school student by a teacher must be evaluated in the context of the school environment, where restricting the

**2.** We have relied upon the *Attson* case when determining whether private actors have become government agents for purposes of the Fourth Amendment. *United States v. McAllister*, 18 F.3d 1412, 1418 (7th Cir.1994).

liberty of students is a *sine qua non* of the educational process. Deprivations of liberty in schools serve the end of compulsory education and do not inherently pose constitutional problems.

This premise of a general constitutionally permissible liberty restriction is, of course, not the case in the law enforcement context. Seizures of individuals by police are premised on society's need to apprehend and punish violators of the law. As such, they inherently threaten individuals' liberty to live free of the criminal justice process. There is no analogous liberty for students to live free of the educational process.

We scrutinize seizures when carried out by police both because they deprive individuals of liberty in the immediate sense and because they threaten prolonged incarceration. *See Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968). Yet, even in this area, the standard for a mere investigatory stop is not as demanding as the standard for an arrest. *Id.* at 26–27, 88 S.Ct. at 1883. We take from this distinction between types of police seizures a need to fit a proper Fourth Amendment standard to the threat, or lack thereof, that a given type of seizure poses.

The distinction between deprivations of liberty in school and in the law enforcement context highlights what, to begin with, amounts to an awkward fit between the Fourth Amendment and non-law enforcement action. With regard to school searches, or even school seizures of students' property, the fit is not so difficult because the goals of such searches and seizures are similar to the goals of law enforcement in searching and seizing private property: to detect aberrant behavior and to retrieve property.

There is little parallel, however, between the school and law enforcement situations when there is a seizure of the person. The basic purpose for the deprivation of a student's personal liberty by a teacher is education, while the basic purpose for the deprivation of liberty of a criminal suspect by a police officer is investigation or apprehension. The application of the Fourth Amendment is necessarily different in these situations.

As we noted earlier, the Supreme Court has recognized that students have a reduced liberty interest once inside the schoolhouse gate. *Vernonia,* —— U.S. at ——, 115 S.Ct. at 2392. This interest cannot be subject to wholesale diminution in the name of maintaining order and discipline, but we recognize that the rising tide of violence in our nation's schools warrants decisive attention.

Given the wide range of methods that teachers and administrators exercise in legitimately restricting students' liberty during the educational process, any rule designed to protect students' limited liberty rights must identify a recognizable level at which such restrictions become unreasonable in light of the Fourth Amendment.

█ We thus hold that, in the context of a public school, a teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent. Therefore, in seeking to maintain order and discipline, a teacher or administrator is simply constrained to taking reasonable action to achieve those goals. Depending on the circumstances, reasonable action may certainly include the seizure of a student in the face of provocative or disruptive behavior.

This test should afford teachers and administrators an acceptable range of action for dealing with disruptive students while still protecting students against the potentially excessive use of state power. And because it should yield a narrow range of Fourth Amendment seizure claims arising out of school disciplinary matters, our formulation is consistent with the Supreme Court's view "that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988). The Court's view is intended to keep schools in the business of educating children and out of the courtroom facing frivolous litigation.

Moreover, the standard retains, as all Fourth Amendment reasonableness inquiries

must, an objective perspective. *See Graham v. Connor,* 490 U.S. 386, 399, 109 S.Ct. 1865, 1873, 104 L.Ed.2d 443 (1989). It does not ask what the teacher's intentions were, and it does not ask if the particular student thought the conduct was out of bounds. It asks, at bottom, whether under the circumstances presented and known the seizure was objectively unreasonable.

■ Viewing the facts in the light most favorable to Wallace, it is clear that she has not stated a viable claim for the constitutional deprivation of her liberty interest as a public school student. Cliffe ordered Wallace out of the classroom because Wallace was engaged in a heated exchange with Fairbanks—he wanted to quell the disruption being caused by the obscenities and invitation to fight. Then, because she "wasn't moving fast enough for him," Cliffe grabbed Wallace's elbow and her wrist in order to expedite her departure. When she asked him to let go, he did, and she proceeded out of the room. Given these circumstances, we do not believe a reasonable jury could find that Cliffe's actions were disproportionate to the interference with the educational process that the situation presented. All these facts show a teacher doing what he thought best to break up a fight so that some modicum of an educational atmosphere could prevail. Cliffe's conduct can hardly be seen as unreasonable. In fact, the only thing unreasonable in this scenario is that Wallace has made a federal case out of a routine school disciplinary matter.

**Fourteenth Amendment and Due Process**

■ Wallace also claims that Cliffe violated her substantive due process rights under the Fourteenth Amendment by using excessive corporal punishment when he seized her to escort her from the classroom. However, we do not believe that the Fourteenth Amendment's Due Process Clause affords Wallace any greater protection than the Fourth Amendment from unwarranted discipline while in school. *See Darryl H. v. Coler,*

801 F.2d 893, 901 n. 7 (7th Cir.1986) ("Fourteenth Amendment due process analysis obviously differs in some respects from Fourth Amendment analysis. However, ... we believe both interests can be treated together" because, under both standards, the court must engage in the same balance of interests.).

Both parties assume a constitutional right of a student to be free from excessive corporal punishment and that the only debate is whether Wallace has alleged facts sufficient to fulfill the requirements of the standard articulated by the district court. We, however, have never acknowledged such a substantive due process right, much less established a test for deciding when it has been violated.

The Supreme Court has explicitly refused to address whether a separate federal constitutional right protects students from excessive corporal punishment. *Ingraham,* 430 U.S. at 659 n. 12, 97 S.Ct. at 1406 n. 12. The *Ingraham* Court reasoned that corporal punishment did not implicate a right to be free from cruel or unusual punishment under the Eighth Amendment. *Id.* at 670, 97 S.Ct. at 1412. It also decided that, while corporal punishment in public schools implicates students' liberty interests, students are not entitled to any sort of procedural due process before corporal punishment is inflicted; causes of action for punishments that exceed common law reasonableness limitations provide a sufficient post-deprivation remedy. *Id.* at 672, 97 S.Ct. at 1413.

The Fifth Circuit considered and rejected a substantive due process claim for excessive corporal punishment. *Ingraham v. Wright,* 525 F.2d 909, 917 (5th Cir.1976) (en banc), *aff'd on other grounds,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The Fifth Circuit has maintained its position in subsequent cases. *See, e.g., Fee v. Herndon,* 900 F.2d 804 (5th Cir.), *cert. denied,* 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); *Woodard v. Los Fresnos Indep. School Dist.,* 732 F.2d 1243, 1246 (5th Cir.1984).[3]

---

**3.** Several other circuits that have considered the issue have found that students have a substantive due process right to be free from excessive corporal punishment. *See, e.g., Wise v. Pea Ridge*

*Sch. Dist.,* 855 F.2d 560 (8th Cir.1988); *Metzger by Metzger v. Osbeck,* 841 F.2d 518 (3rd Cir. 1988); *Webb v. McCullough,* 828 F.2d 1151 (6th Cir.1987); *Garcia by Garcia v. Miera,* 817 F.2d

In reaching its position, the Fifth Circuit reasoned that, while corporal punishment may violate a student's substantive due process rights when it is "arbitrary, capricious, or wholly unrelated to the legitimate goal of maintaining an atmosphere conducive to learning," if a state provides remedies for mistreatment of students by educators, that state by definition does not act arbitrarily. *Herndon*, 900 F.2d at 808 (quoting *Woodard*, 732 F.2d at 1246).

■ Because a student is at least as much seized when a school official administers corporal punishment as Wallace was here, corporal punishment may be evaluated under the Fourth Amendment standard. Therefore, even assuming that Cliffe's actions constituted corporal punishment, we reject Wallace's theory of recovery under the Fourteenth Amendment as we have done under the Fourth Amendment.[4]

### CONCLUSION

We have concluded that public school students have protection of their liberty rights under the Fourth Amendment, but we ought not countenance the degradation of this historic shield into a device by which ill-informed or inventive litigants attempt to undermine the necessary authority that teachers and school administrators exert over students. Public school teachers and administrators must have considerable latitude in performing their educational responsibilities, including maintaining order and discipline by reasonably restraining the liberty of students.

Here, a teacher was confronted in his classroom with two teenage girls shouting obscenities and a fight about to break out; he separated the girls and ordered one out of the classroom—briefly seizing her in the process. This most emphatically is not a matter

rising to the level of a constitutional violation. This type of § 1983 litigation denigrates the Constitution and is a disservice to school systems, the federal courts, and the public they serve. The summary judgment entered by the district court is AFFIRMED.

---

650 (10th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *Hall v. Tawney*, 621 F.2d 607 (4th Cir.1980).

**4.** We express no opinion as to whether the Fourteenth Amendment provides students with a remedy for non-disciplinary deprivations of liberty at the hands of school officials under a theory that school officials promoted school policies that facilitated a climate where children were deprived

of their constitutional rights. *See, e.g., Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 730 (3d Cir.1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); *see also J.O. & P.O. v. Alton Community Sch. Dist.*, 909 F.2d 267, 271–72 (7th Cir.1990) (noting that the plaintiff had not alleged such a theory and therefore declining to consider it).