Robert KURILLA, Individually and as parent and natural guardian Robert J. Kurilla, Plaintiff,

v.

Kevin CALLAHAN, et al., Defendants.

No. Civ.A. 97–0187.

United States District Court, M.D. Pennsylvania.

Sept. 30, 1999.

Barry H. Dyller, Wilkes Barre, PA, for plaintiff.

William J. Schmidt, Philadelphia, PA, Richard A. Polachek, Wilkes Barre, PA, for defendants.

## MEMORANDUM

VANASKIE, Chief Judge.

This is a civil rights action under 42 U.S.C. § 1983 set in the factual context of use of force by a school teacher, Kevin Callahan, against a student, Robert Kurilla. The procedural context in which this matter is now before the Court is provided by Kurilla's objections to the Report and

Recommendation of Magistrate Judge Thomas M. Blewitt. Magistrate Judge Blewitt proposed that the Court grant the summary judgment motions of Callahan and Mid–Valley School District, his employer.

Kurilla contends that Magistrate Judge Blewitt erred in applying the substantive due process "shocks the conscience" test to Callahan's conduct, asserting that the applicable test is provided by the Fourth Amendment "reasonableness" standard. Kurilla argues that the fact that Callahan was convicted of the summary offense of harassment in connection with the incident giving rise to this lawsuit entitles Kurilla to summary judgment on liability. Alternatively, Kurilla contends that there is a triable issue as to whether Callahan's conduct "shocks the conscience."

Having carefully considered the issues *de novo*, I find that the momentary use of force by a school teacher is to be judged by the shocks the conscience standard. I also find that Callahan's conduct, which consisted of striking a blow to Kurilla's chest that resulted in bruising but otherwise did not require medical care, was not so " 'brutal' and 'offensive to human dignity' " as to shock the judicial conscience. *Johnson v. Glick*, 481 F.2d 1028, 1033 n. 6 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Accordingly, I will adopt Magistrate Judge Blewitt's recommendation that Callahan's summary judgment motion be granted.

While Callahan's conduct did not violate substantive due standards, Mid–Valley School District may nonetheless be held accountable for having established a policy or custom that caused the injury allegedly sustained by Kurilla. Because I find that Kurilla has presented sufficient evidence to warrant a trial on the question of the existence of a policy or custom to tolerate use of excessive force by a teacher, the School District's summary judgment motion will be denied.

## I. Background

On October 3, 1995, Kurilla was an eighth grade student at Mid Valley Secondary Center. (Kurilla's Aff., Dkt. Entry 39 at ¶ 2.) According to Kurilla, on that date, he was attending a study hall supervised by Defendant Kevin Callahan ("Callahan"), where Kurilla got into a fight with another student. *Id.* at ¶ 3. Callahan called both Kurilla and the other student to his desk, and asked the other student what happened. *Id.* at ¶ 4. Kurilla interrupted and began explaining his side of the story, to which Callahan responded by telling Kurilla to "Shut up or I will lay you out on the floor." *Id.* at ¶ 4. Kurilla attempted again to tell his side of the story when Callahan grabbed him by the shirt with clenched hands and proceeded to pull Kurilla very hard, causing Kurilla's chest to strike Callahan's closed fists. *Id.* at ¶ 5. Kurilla claims that Callahan's action, which allegedly had the identical effect as if Callahan punched him, resulted in bruising on Kurilla's chest. *Id.* at ¶ 5.

The bruise was on Kurilla's right side, above the nipple. (Kurilla Dep. at 60.) In addition to the bruise on his chest, Kurilla alleges that he had a red mark on the back of his neck and on the left side of his chest. *Id.* at 61. The only photographs taken were of the bruise on Kurilla's right side, above the nipple. *Id.* According to Kurilla's father, the photographs were taken two or three hours after the incident with Callahan. (Kurilla Sr. Dep. at 26, 28.)

Following the incident with Callahan, Kurilla saw the family doctor, Dr. Gazmen. (*Id.* at 29.) Dr. Gazmen performed a complete examination, but no x-rays were taken. (*Id.* at 37.) Dr. Gazmen concluded that there was no internal damage and that there was no need to prescribe any medication or to impose any restrictions on Kurilla. (*Id.* at 69–70.) Kurilla's father was told to call Dr. Gazmen if there were any problems, but Kurilla's father never called. *Id.*

At the time of the altercation, Kurilla was five (5) feet, eight (8) to nine (9) inches

tall and weighed between 175 to 180 pounds. (*Id.* at 40.) Kurilla's father claims that his son now suffers from anxiety, but he has not taken him to any doctors, aside from the one visit to the family doctor discussed above. (*Id.* at 43–45, 49.) Moreover, Kurilla has no plans to seek further treatment in the future, and the total medical bills incurred as a result of the incident was $35. (*Id.* at 44–45, 71.)

Callahan was subsequently tried and convicted of the summary offense of harassment of Kurilla.[1] Callahan was also convicted of harassment of two other students in separate incidents, one occurring before the matter involving Kurilla and one occurring two days after the Kurilla incident. Callahan appealed his guilty verdict to the Pennsylvania Superior Court, which dismissed his appeal. Kurilla filed this action on February 6, 1997, asserting claims under 42 U.S.C. § 1983 and state law.

A motion for summary judgment was filed by Defendant Mid Valley School District ("School District") on February 2, 1998. (Def.'s Mot.Summ.J., Dkt. Entry 26 at 1.) The School District argued that Kurilla failed to adduce evidence demonstrating the School District had a policy or custom of tolerating its teachers' violent behavior towards students, or that the School District created a danger to students. *Id.* at 2. On January 15, 1999, a motion for partial summary judgment was filed by Callahan. (Def.'s Mot. Partial Summ.J., Dkt. Entry 42.) Callahan sought dismissal of Kurilla's § 1983 claim, assert-

ing that Callahan's conduct was not sufficient to impose liability under § 1983. (Def.'s Supp.Br., Dkt. Entry 44 at 4.) On January 25, 1999, Kurilla filed a motion for partial summary judgment with respect to liability on his civil rights claim, alleging that Callahan's unreasonable conduct violated Kurilla's Fourth and Fourteenth Amendment rights. (Pl.'s Mot. Partial Summ.J., Dkt Entry 45 at 1.)

Magistrate Judge Blewitt, to whom this matter had been assigned for pretrial management, concluded that the School District and Callahan were entitled to summary judgment. With respect to the School District, Magistrate Judge Blewitt reasoned that the plaintiffs failed to present competent evidence sufficient to warrant a trial on the questions of whether the School District had a policy or custom of tolerating violent behavior by its teachers towards students, or whether it acted in willful disregard for the safety of Kurilla. As to Callahan, Magistrate Judge Blewitt rejected Kurilla's assertion that Fourth Amendment principles were applicable. Instead, Magistrate Judge Blewitt found that Kurilla's claims were properly evaluated under the substantive due process component of the Fourteenth Amendment and its "shock the conscience" standard. Concluding that Kurilla's claim failed to "shock the conscience," Magistrate Judge Blewitt recommended that Callahan's motion for partial summary judgment be granted. Magistrate Judge Blewitt also recommended that Kurilla's motion for partial

---

**1.** Under Pennsylvania law, a summary offense is one punishable by up to 90 days imprisonment. A person commits the offense of harassment when, "with intent to harass, annoy or alarm another person: (1) he strikes, shoves, kicks or otherwise subjects [another] to physical contact, or attempts or threatens to do the same." 18 Pa.C.S.A. § 2209(a)(1). Because Callahan contended that he was justified in striking Kurilla, Pennsylvania law on the defense of justification was considered by the Pennsylvania court. Pennsylvania law provides that use of force is justifiable if a teacher believes that the force used is necessary to maintain discipline in the classroom,

the use of such force is consistent with the student's welfare, and the degree of force, if it had been used by a parent, would not be "designed to cause death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation." 18 Pa.C.S.A. § 509(2). The Pennsylvania court, while giving Callahan "the benefit of the doubt" in finding that he was "quelling a disturbance," found that he had not "acted with the minimum force required and in a manner consistent with the welfare of the minor." *Commonwealth v. Callahan*, No. 96–S–90, Op. at 8 (Pa. Common Pleas, Lackawanna County).

summary judgment be denied and that supplemental jurisdiction over the pendent state law claims be declined. The matter is now before the Court on Kurilla's objections.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Jones v. Witinski*, 931 F.Supp. 364, 365. (M.D.Pa.1996). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court opined: ·

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to ·establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

An issue of fact is " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693–94 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Material facts are those which will affect the outcome of the trial under governing law." *Jones v. Witinski*, 931 F.Supp. at 365. To determine whether an issue of material

fact exists, the court must consider the evidence in the light most favorable to the nonmovant. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir.1988).

### B. The Excessive Force Claim Under § 1983

#### 1. *The Constitutional Standard to be Applied in School Excessive Force Cases.*

The threshold inquiry in addressing Kurilla's § 1983 excessive force claim involves "identifying the specific constitutional right allegedly infringed. . . ." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Identification of the specific constitutional right allegedly infringed is essential because the standard against which the defendant's conduct is to be assessed depends upon the right that is purportedly violated. *See Metcalf v. Long*, 615 F.Supp. 1108, 1118 (D.Del.1985). For example, an excessive force claim in the context of an arrest is analyzed under the Fourth Amendment reasonableness standard. *Graham*, 490 U.S. at 395–97, 109 S.Ct. 1865. But once a person has been convicted and sentenced, an excessive force claim is analyzed under the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Metcalf*, 615 F.Supp. at 1119. In Eighth Amendment excessive force cases, "the core judicial inquiry is . . . whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan*, 503 U.S. 1, 6, 112 S.Ct. 995, 999, 117 L.Ed.2d 156, 166 (1992). Claims of abusive treatment of pretrial detainees are analyzed under substantive due process principles. *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. 1865; *Bell v. Wolfish*, 441 U.S. 520, 535–39, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Williams v. Mussomelli*, 722 F.2d 1130, 1133 (3d Cir.1983); *Patzig v. O'Neil*, 577 F.2d 841, 847 (3d Cir.1978). The applicable test under the Due Process Clause is whether the defendant's conduct

"shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998); *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir.1994) (*en banc*).

Kurilla argues that the Fourth Amendment "reasonableness" standard should be applied in this case. The premise of this argument is that he was subjected to a "seizure" when Callahan grabbed his shirt and punched him in the chest. Pointing out that the Court in *Graham* said that a "seizure" occurs when a government actor " 'by means of physical force or show of authority, . . . in some way restrains the liberty of a citizen,' " 490 U.S. at 395 n. 10, 109 S.Ct. 1865, Kurilla asserts that Callahan's conduct must be regarded as a Fourth Amendment seizure. Based upon the Pennsylvania state court's finding in connection with the harassment charge that Callahan's use of force was not justifiable under the circumstances, Kurilla maintains that he is entitled to a finding in his favor on Callahan's § 1983 liability.

*Graham* involved a § 1983 claim against several police officers accused of using excessive force during an investigatory stop. 490 U.S. at 389, 109 S.Ct. 1865. *Graham* discouraged use of substantive due process analysis, and required that courts first consider whether there is a specific constitutional right infringed by the challenged action. 490 U.S. at 394, 109 S.Ct. 1865. The Court observed that in *most* instances, the Fourth or the Eighth Amendment would supply the constitutional peg on which to hang the civil rights claim.[2] As noted above, in the context of a law enforcement officer's investigatory stop, the Court in *Graham* found that Fourth Amendment standards were applicable.

Prior to *Graham*, our court of appeals had held that in the school physical discipline context, a government actor's conduct is to be assessed under substantive due process principles. *See Metzger By and Through Metzger v. Osbeck*, 841 F.2d 518 (3d Cir.1988). Specifically, in *Metzger*, a teacher, after hearing Metzger use foul language, placed his arms around Metzger's neck and shoulder area, and lifted him to the point where Metzger felt pressure underneath his chin and had to stand on his toes. When the teacher released him, Metzger, who had lost consciousness, fell face down, lacerated his lip, broke his nose, fractured his teeth, and sustained other injuries that required hospitalization. In reversing the grant of summary judgment in favor of the teacher, the majority in *Metzger* held that "[a] decision to discipline a student, if accomplished through excessive force and appreciable physical pain, may constitute an invasion of the child's Fifth Amendment liberty interest in his personal security and a violation of substantive due process prohibited by the Fourteenth Amendment." *Id.* at 520.[3]

Kurilla contends that *Metzger* is not controlling here because it was decided prior to *Graham*. According to Kurilla, *Graham* changed the legal landscape, so that "the use of excessive force by government actors is a seizure governed by the Fourth Amendment." (Br. in Supp. of Objections to the Report and Recommendation, Dkt. Entry 57 at 29.)

Contrary to Kurilla's assertion, *Graham* does not mandate application of Fourth Amendment principles to *all* claims of excessive force by *all* government actors. Factually, *Graham* is limited to claims against law enforcement officers engaged

---

2. The Eighth Amendment supplies the appropriate constitutional peg where a convicted inmate alleges excessive force. The Court has held that the Eighth Amendment does not apply to disciplinary corporal punishment imposed by public school teachers or administrators. *See Ingraham v. Wright*, 430 U.S. 651, 671, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

3. Judge Weis, in a concurring and dissenting opinion, observed that the majority's analysis recognizes that "the teacher constitutionally was permitted to utilize physical contact in disciplining the student." *Id.* at 522.

in law enforcement activities. 490 U.S. at 394, 109 S.Ct. 1865 ("Where ... the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment. ...") *Graham* recognized that some excessive force claims, such as those made by pretrial detainees, would properly be analyzed under substantive due process standards. *Id.* at 395 n. 10, 109 S.Ct. 1865.

In *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Court specifically disclaimed any intent to have all constitutional claims relating to physically abusive government conduct analyzed under the Fourth or Eighth Amendments. *Id.* at 1715. As the Court explained, " '*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, ... the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' " *Id., quoting United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 1228 n. 7, 137 L.Ed.2d 432 (1997). Thus, substantive due process analysis remains appropriate if the plaintiff's claim is not "covered by" the Fourth Amendment. *Id.*

In this case, the question is whether the momentary use of force by a teacher against a student who refuses to be quiet despite having been admonished not to interrupt another student's account of an in-classroom altercation is "covered by" the Fourth Amendment prohibition against unreasonable seizures. In making this determination, it is important to bear in mind the "unique constitutional position" of pub-

lic school students. *Wallace by Wallace v. Batavia School District 101*, 68 F.3d 1010, 1013 (7th Cir.1995). "Once under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators." *Id.* at 1013. Public school children are subject to the state's authority in a way that has been described as "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia School District 47 J. v. Acton*, 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

Fourth Amendment jurisprudence dealing with "seizures" generally focuses on "the initial deprivation of liberty." *Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997) (*en banc*). As recognized in *Ingraham*, the Fourth Amendment's "principal concern ... is with intrusions on privacy. ..." 430 U.S. at 674 n. 42, 97 S.Ct. 1401. Where the constitutional concern is not " 'with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails,' but rather with the conditions of ongoing custody following such curtailment of liberty," substantive due process principles inform the judicial analysis. *Id.* at 1162, *quoting Bell v. Wolfish*, 441 U.S. at 533–34, 99 S.Ct. 1861. A teacher's use of physical force is more properly regarded as a condition of the school environment in which liberty is necessarily already curtailed. Thus, the factual context presented in this case is not "covered by" the Fourth Amendment.[4]

As pointed out by Kurilla, the Third Circuit has not explicitly considered the

---

4. The Supreme Court has held that Fourth Amendment principles must accommodate the "special needs" of the public school setting. *See Vernonia School District 47J. v. Acton*, 515 U.S. at 653–657, 115 S.Ct. 2386 (1995); *New Jersey v. T.L.O.*, 469 U.S. at 336–40, 105 S.Ct. 733 (1985). Thus, a "reasonableness" inquiry in a public school setting where the Fourth Amendment textually applies, for example, a search of a student's locker, "cannot disregard the school's custo-

dial and tutelary responsibility for children." *Vernonia School District*, 515 U.S. at 656, 115 S.Ct. 2386. A decision not to apply Fourth Amendment jurisprudence to the momentary use of force by a teacher, a factual context not literally covered by the Fourth Amendment, but instead to apply substantive due process strictures, is consistent with the deference accorded school administrators and teachers even in the setting where the Fourth Amendment textually applies.

impact of *Graham* on its holding in *Metzger* that substantive due process principles inform the analysis of an excessive force claim against a school teacher.[5] In *Jones v. Witinski*, 931 F.Supp. 364, 366–67 (M.D.Pa.1996), the Hon. James F. McClure of this Court did consider the impact of *Graham* and held that the "shocks the conscience" test should continue to be applied to school excessive force cases. In *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 724–25 (6th Cir.1996), the court held that a claim of physical abuse by a school teacher was properly analyzed under substantive due process principles, explaining that such claims "are premised on the alleged violation of a constitutionally protected liberty interest, within the meaning of the Fourteenth Amendment, in their personal bodily integrity." This conclusion is rooted in *Ingraham v. Wright, supra*, which held that deliberate application of force by school officials, "restraining the child and inflicting appreciable physical pain, implicates liberty interests protected by the Fourteenth Amendment." *Ingraham v. Wright*, 430 U.S. at 674, 97 S.Ct. 1401. *Metzger* relied on *Ingraham* to hold that use of force by a school teacher is governed by substantive due process standards.

Kurilla notes that some other courts have applied the Fourth Amendment in the school discipline context. (Br. in Supp. of Objections to Report and Recommendation, Dkt. Entry 57 at 27–28.) With one exception, however, the cases cited by Kurilla involved factual scenarios more closely aligned with Fourth Amendment protection. For example, in *Hassan v. Lubbock Independent School District*, 55 F.3d 1075 (5th Cir.1995), the plaintiff complained of being placed in a holding cell for approximately 50 minutes while fellow students toured a juvenile detention center. In *Edwards v. Rees*, 883 F.2d 882 (10th Cir. 1989), the challenged action involved a 20-minute interrogation. In *Rasmus v. Arizona*, 939 F.Supp. 709 (D.Ariz.1996), the student had been locked in a "time out room" for approximately 10 minutes. In *Bills by Bills v. Homer Consolidated School District No. 33–C*, 959 F.Supp. 507 (N.D.Ill.1997), a claim that a principal repeatedly removed a student from class and interrogated him on a daily basis for at least five days was analyzed under Fourth Amendment principles on the ground that the student had been "seized." None of the cases involved the application of physical force. Moreover, these precedents are less persuasive because the courts did not discuss the fact that students in public school are subject to the control of school authorities and may be ordered to appear before a principal or go to a particular classroom.

The only case cited by Kurilla that applied Fourth Amendment principles to a claim of excessive force by a teacher was *Wallace*, 68 F.3d 1010. In *Wallace*, a teacher, in an effort to break up a fight between two students, grabbed one of the students by her wrist and elbow to move her out of the classroom. *Id.* at 1011. While finding that the Fourth Amendment "covered" this scenario, the Seventh Circuit also noted that there is "little parallel . . . between the school and law enforcement situations when there is a seizure of the person." *Id.* at 1014. Explaining that "[t]he basic purpose for the deprivation of a student's personal liberty by a teacher is education, while the basic purpose for the deprivation of liberty of a criminal suspect by a police officer is investigation or apprehension," the court held that "application of the Fourth Amendment is *necessarily different*" in the school context. *Id.* (emphasis added). The court elaborated:

> The reasonableness of a Fourth Amendment seizure of a public school student by a teacher must be evaluated in the

---

**5.** In *Searles v. SEPTA*, 990 F.2d 789, 794 (3d Cir.1993), the court cited *Metzger* as having firmly established that a child's liberty interest in personal security was afforded protection under substantive due process principles.

context of the school environment, where restricting the liberty of students is a *sine qua non* of the educational process. Deprivations of liberty in schools serve the end of compulsory education and do not inherently pose constitutional problems.

The premise of a general constitutionally permissible liberty restriction is, of course, not the case in the law enforcement context. Seizures of individuals by police are premised on society's need to apprehend and punish violators of the law. As such, they inherently threaten the individual's liberty to live free of the criminal justice process. There is no analogous liberty for students to live free of the educational process.

*Id.* at 1013–14. The court went on to apply an objective reasonableness standard that purports to take into account the "special needs" of the school environment. Under the test applied by the Seventh Circuit, the court does not concern itself with the teacher's intentions, but instead with whether the alleged seizure "was objectively unreasonable."[6]

*Wallace* recognized that the school environment is qualitatively different than the law enforcement environment. Public school students' liberty interests are necessarily restrained in a manner that is not present outside the school setting. Some official conduct that would not be tolerated outside school must be allowed in the school. "[A] proper educational environment requires close supervision of school children, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." *T.L.O.*, 469 U.S. at 339, 105 S.Ct. 733. *Wallace* accommodates this distinctive environment by qualifying the "objective reasonableness" inquiry. But *Wallace* suggests no meaningful standard by which this accommodation is to be effected. While the "shocks the conscience" test has

been justly criticized as "amorphous and imprecise," *Fagan*, 22 F.3d at 1308, standards have been established for its application. More importantly, substantive due process has been the basis for considering claims of governmental abuse of power where the conduct in question does not implicate a specific constitutional protection. *See County of Sacramento v. Lewis, supra* (refusing to apply Fourth Amendment to police chase, but instead applying the "shocks the conscience" test). The momentary application of force by a teacher in reaction to a disruptive student is a scenario to which the Fourth Amendment does not textually or historically apply. I thus decline to follow *Wallace*.

In short, the momentary use of physical force by a teacher in reaction to a disruptive or unruly student does not effect a "seizure" of the student under the Fourth Amendment. Because Kurilla's claim is not governed by the Fourth Amendment, substantive due process principles will be applied to determine whether there is a triable excessive force claim here.

### 2. Application of the Shocks-the-Conscience Test

 Substantive due process has been described as "the right to be free from state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning and harmful as literally to 'shock the conscience' of the court." *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 725 (6th Cir.1996). The threshold for establishing a constitutional tort for excessive use of force is set so high in light of Supreme Court admonitions "against an overly generous interpretation of the substantive component of the Due Process Clause." *Fagan v. City of Vineland*, 22 F.3d at 1306 n. 6. The conduct in question "must do more than 'offend some fastidious squeamishness or private sentimentalism....'" *Johnson v.*

---

**6.** The *Wallace* court concluded that the teacher and the School District were entitled to summary judgment, finding, as a matter of

law, that the teacher's conduct was not objectively unreasonable. *Id.* at 1015.

*Glick,* 481 F.2d at 1028 n. 6. "[T]he constitutional concept of conscience-shocking duplicates no traditional category of common-law fault. . . ." *County of Sacramento v. Lewis,* 118 S.Ct. at 1717. The pertinent inquiry is " 'whether the force applied caused injuries so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.' " *Jones v. Witinski,* 931 F.Supp. at 369, *quoting Webb v. McCullough,* 828 F.2d 1151, 1158 (6th Cir.1987).

In this case, Callahan's punching of Kurilla in the chest caused a bruise and some red marks. While Kurilla sought medical care, there is no evidence that medical attention was reasonably necessary. Kurilla's injuries did not even warrant x-ray examination or prescription of any medication. Thus, Kurilla's injuries could hardly be described as "severe".[7]

Callahan's striking of a blow to Kurilla's chest is akin to the slap across the student's face considered in *Lillard v. Shelby County Board of Education, supra.* In that case, the court held:

> [I]t is simply inconceivable that a single slap could shock the conscience. We do

not quarrel with the suggestion that [the teacher's] actions were careless and unwise; but they fall short of 'brutal,' or 'inhumane,' or any of the other adjectives employed to describe an act so vicious as to constitute a violation of substantive due process. In contrast to *Webb* the blow inflicted here was neither severe in force nor administered repeatedly. Moreover, the slap did not result in any physical injury to Lillard. While we do not mean to suggest that school systems should tolerate a teacher who slaps a student in anger, neither do we conclude that one slap, even if made for no legitimate purpose, rises to the level of a constitutional violation. *While [the teacher] should reasonably expect to face serious consequences for his treatment of Lillard, those consequences should not be found in a federal court through the mechanism of a section 1983 action.*

76 F.3d at 726 (emphasis added).

This rationale applies with equal force here. Callahan was reacting to a disruptive student. While Callahan's reaction could be categorized as overzealous, and may be actionable under state tort law, it does not amount " 'to a brutal and inhumane abuse of official power literally shocking to the conscience.' " *Jones v. Witinski,* 931 F.Supp. at 369.[8]

---

7. The slight injury in this case contrasts sharply with the injuries sustained in school excessive force cases where summary judgment was denied. For example, in *Metzger,* the student sustained a broken nose, fractured teeth, lacerations and other injuries requiring hospitalization. In *Hall v. Tawney,* 621 F.2d 607 (4th Cir.1980), a student had been beaten with a paddle to such a degree that hospitalization for a period of ten days was required. In *Garcia by Garcia v. Miera,* 817 F.2d 650, 658 (10th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), a student had been hit multiple times with a split board causing bleeding and a permanent scar. In *Webb v. McCullough, supra,* a student was slapped, hit with a door and thrown against a wall by the school principal.

8. Kurilla asserts that summary judgment is inappropriate because the question of whether Callahan intended to harm him is a quin-

tessential jury issue. Kurilla claims that there is sufficient evidence of an intent to harm from the fact that Callahan responded to Kurilla's first interruption by warning him to "shut up or I will lay you out on the floor." Intent to harm is not, as Kurilla suggests, the dispositive issue under the shocks the conscience standard. It is only one of several factors, and the circumstances must show that the conduct was "so inspired by malice . . . that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Webb,* 828 F.2d at 1158. No reasonable jury could find that Callahan's statement made to an unruly student evidenced such a malevolent state of mind. Even if the statement would support such an inference, the nature of the injury and the manner in which it was inflicted do not support an inference of brutal or inhumane conduct.

"To say that due process is not offended by [Callahan's] conduct described here is not, of course, to imply anything about its appropriate treatment under state law." *County of Sacramento v. Lewis,* 118 S.Ct. at 1721 n. 14. But "[d]ecisions about civil liability standards that 'involve a host of policy choices .... must be made by locally elected representatives [or by courts enforcing the common law of torts], rather than federal judges interpreting the basic charter of Government for the entire country." *Id., quoting Collins v. Harker Heights,* 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Kurilla has asserted common law tort claims of assault, battery, and intentional infliction of emotional distress. The viability of those claims is unaffected by the decision here. Moreover, the state criminal process was employed here and Kurilla could petition the school board for redress. That Kurilla is without a civil rights claim for Callahan's conduct thus does not leave him without effective means to redress the alleged wrong.

In summary, while Callahan's conduct violated state laws that balance the justification for use of force against a teacher's right to use force to maintain discipline, and may be actionable under tort law, it was not so brutal or inhumane as to shock the conscience. Accordingly, Callahan's summary judgment motion will be granted and Kurilla's summary judgment motion will be denied.

## C. Kurilla's Claims Against Mid–Valley School District.

That Callahan's conduct does not shock the conscience does not necessarily relieve Mid–Valley School District of liability under 42 U.S.C. § 1983. "A finding of municipal liability does not depend automatically or necessarily on the liability of any [municipal] officer." *Fagan,* 22 F.3d at 1292. Third Circuit precedent plainly requires that district courts review the plaintiff's municipal liability claim independently of the § 1983 claim asserted against an individual local government actor. *Kneipp v. Tedder,* 95 F.3d 1199, 1213 (3d Cir.1996); *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1058–65 (3d Cir.1991). As explained in *Fagan:*

> Even if an officer's actions caused death or injury, he can only be liable under § 1983 and the Fourteenth Amendment if his conduct "shocks the conscience." The fact that the officer's conduct may not meet the standard does not negate the injury suffered by the plaintiff as a result. If it can be shown that the plaintiff suffered an injury, which amounts to deprivation of life or liberty, because the officer was following a city policy reflecting the city policymakers' deliberate indifference to constitution rights, then the City is directly liable under Section 1983 for causing violation of the plaintiff's Fourteenth Amendment rights.

22 F.3d at 1292.

As noted above, application of force by a teacher implicates liberty interests protected by the Fourteenth Amendment. Consistent with the reasoning of *Fagan, Kneipp,* and *Simmons,* Mid–Valley School District may be held liable if it had a custom or policy condoning use of excessive force by teachers that evidenced a deliberate indifference to the student's constitutional rights in bodily integrity protected by the Due Process Clause of the Fourteenth Amendment.

In determining what constitutes an official policy or custom, the Third Circuit has held that "[a] government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir. 1990)). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or

those officials whose acts may fairly said to be those of the municipality." *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Custom, on the other hand, may be proven by evidence of knowledge and acquiescence. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir.1989). Custom also can be established by "showing that a course of conduct, though not authorized by law, is so permanent and well-settled as to virtually constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990).

With respect to both policies and customs, a "plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Id.* at 850; *see Kneipp*, 95 F.3d at 1212, ("a prerequisite to establishing liability in either situation is a showing that a policymaker was responsible either for the policy, or through acquiescence, for the custom"). A "policymaker" is one who has the final, unreviewable discretion to make a decision. *Kneipp*, 95 F.3d at 1213 (citing *Andrews*, 895 F.2d at 1481).

In addition to proving that a policy or custom exists, the plaintiff must prove that the alleged policy or custom was the proximate cause of the plaintiff's harm. *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 910 (3d Cir.1984). "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (requiring that the municipal policy or custom be the "moving force" behind the claimed constitutional violation and that there be an "affirmative link" between the policy or custom and the constitutional violation). This connection can be established by proving "that policymakers were aware of similar conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury." *Losch*, 736 F.2d at 910.

■ Thus, to establish liability on the part of the School District under § 1983, Kurilla must establish that officials at a policymaking or supervisory level 1) had actual or constructive knowledge that Callahan had violent propensities and was a threat to students; 2) followed a policy or custom of tolerating or ignoring the risk Callahan or other violent teachers posed; and 3) exhibited indifference to the safety of students who were likely to be harmed by violent teachers. *Pearson v. Miller*, 988 F.Supp. 848, 858 (M.D.Pa.1997) (citing *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir.1996)).

Kurilla claims that "[t]he School District had a policy or custom of permitting Callahan to assault students without fear of action being taken against him. This policy or custom also extended to attempting to appease the parents of assaulted students in order to assure that Callahan's assaults would not be made public. The policy or custom also included creating a paper record of willingness to supervise or train Callahan, but in reality refusing to do so." (Pl.'s Supp.Br., Dkt. Entry 57 at 34.)

The School District argues that Kurilla is able to identify only one prior incident involving Callahan, and that this single isolated incident is insufficient to establish that the School District had a policy or custom of tolerating abusive behavior towards students. (Def.'s Supp.Br., Dkt. Entry 27 at 10.) The prior incident occurred when Callahan was teaching a woodworking class on November 8, 1994. (Tr. of Harassment Trial at 47.) During the class period, a student knocked a large stack of textbooks onto the floor from the workbench. *Id.* After students ignored repeated requests by Callahan to pick up the books, a student, who will be referred to as "JJ," began picking up the textbooks, even though she was not the one who originally knocked them over. *Id.* at 37–38. Callahan ostensibly became upset, went to the

table, and knocked the books back onto the floor. *Id.* at 48. In response, JJ told Callahan "don't be such a snot," to which Callahan responded by ordering her out of the classroom. *Id.* at 38. After JJ refused to leave the room, Callahan grabbed JJ by the back of the neck and tried to try to push her out of the classroom. *Id.* As Callahan attempted to push JJ out of the room, JJ's shirt became positioned above her head. *Id.* at 39. Callahan eventually removed JJ to the hallway by grabbing her arm, and proceeded to "bounce" her off the wall in the hallway. *Id.* JJ eventually escaped from Callahan's grip, ran to the office, and asked to call her mother. *Id.* at 44. After being sent to the school nurse, she was told that she was not allowed to call her mother. *Id.* Following the time spent at the nurse's office, JJ was ordered back to class and then suspended. *Id.* The incident resulted in bruises around JJ's neck, fingerprints on her neck, and contusions on her arm. *Id.* at 38–39.

Subsequently, a meeting was held between Callahan, JJ's parents and the school principal, Jerry Preschutti. (Preschutti Dep. at 38–39.) Preschutti recalls that JJ's parents were upset because their daughter was touched and marked by Callahan, and warned the School District that if there was another similar incident, JJ's father would take the matter further. *Id.* at 39. At this point, Preschutti attempted to settle the incident in his office. *Id.* at 41.[9] The purpose of Preschutti's effort was to allow the parents the chance to hear both sides of the story and "to try to keep the situation in a civil, decent matter without the screaming or yelling, bring some common ground where they can both exist and the student can go back to the classroom, the teacher can continue teaching, and the day moves on." *Id.* at 41–42. Preschutti considered the meeting to be a success and that his role as mediator between the parents and Callahan was the appropriate position to be taken. *Id.* at 40–41. In response to a question concerning the resolution of the incident, Preschutti stated:

> The resolution was, they didn't want their daughter touched, if I remember. They were very angry. They weren't sure if—I think—I think he told—the father told Mr. Callahan that if there was another incident in the school, he would bring this to light or something or shed this to light; he would make—you know, go further with it if there was another incident with him grabbing kids or harassing kids or whatever, that he would shed light on this. And that was part of—in other words, *my major function at the time was to protect our employee, in this case it was Mr. Callahan, that it wouldn't go beyond my office.* I felt my obligation as a high school principal there was to keep things under control and try to settle them at that level.

*Id.* at 40 (emphasis added).

The School District contends that this single, isolated incident is insufficient to support the allegation that it had a policy or custom of tolerating violent behavior of teachers toward their students. (Def.'s Supp.Br., Dkt. Entry 27 at 10.) Kurilla disagrees and argues that there is sufficient evidence to evince the School District's policy or custom of tolerating violent propensities of its teachers. For support, Kurilla relies upon *Stoneking v. Bradford Area School Dist.,* 882 F.2d 720 (3d Cir.1989). In *Stoneking,* the Third Circuit concluded that whether there was a policy to tolerate teachers' sexual assaults was a jury question. In explaining its decision, the court stated:

> In sum, there is evidence in the record that between 1978 and 1982 Smith (Prin-

---

**9.** Preschutti stated in his deposition that he "[f]elt an obligation to resolve the matter at this level because of the fact that [he] didn't want to see it escalate to hurt anybody, the student or the teacher. We try to settle them at that level. Any type of incident, as a principal, you would try to settle things in your office where it doesn't go beyond that." *Id.* at 41.

cipal) and Miller (Assistant Principal) received at least five complaints about sexual assaults of female students by teachers and staff members; that Shuey (Superintendent) was told about some of these complaints; that Smith recorded these and other allegations in a secret file at home rather than in the teachers' personnel files, which a jury could view as active concealment; that the defendants gave such teachers excellent performance evaluations, which a jury could view as communication by the defendants to the teachers that the conduct of which they are accused would not be considered to reflect negatively on them; and that Smith and Miller discouraged and/or intimidated students and parents from pursuing complaints, on one occasion by forcing a student to publicly recant her allegation.

*Id.* at 728–29.

Kurilla notes that Preschutti's handling of the JJ incident evidences an intent to avoid disclosure of teachers with violent propensities while not taking any action to curtail those propensities. He buttresses this assertion with the evidence that Callahan was convicted of three violent episodes with students, *i.e.*, the JJ incident, the altercation with Kurilla, and an incident that occurred two days subsequent to the altercation with Kurilla. (Pl.'s Supp.Br., Dkt. Entry 57 at 34.)

The third incident of physical abuse occurred two days after Callahan's alleged physical abuse of Kurilla. (Pl.'s Supp.Br., Dkt. Entry 57 at 34.) In this incident, Callahan pushed his finger into the chest of a student, who will be referred to as "JM." (Pl.'s Atty's Aff., Dkt. Entry 40, Ex. A at 72.) The facts of this altercation are unclear, but it appears that JM was asking for help with his "board" when Callahan grabbed JM's board and jettisoned it across the classroom. *Id.* at 72–73.[10]

10. Callahan was collectively tried and convicted of criminal charges for the three incidents involving JJ, Kurilla, and JM. (Pl.'s Supp.Br., Dkt. Entry 57, Ex. A at 10.) Calla-

In *Beck v. City of Pittsburgh,* 89 F.3d 966 (3d Cir.1996), the Third Circuit reversed a directed verdict entered in favor of a municipality where the plaintiff presented evidence that the municipality's investigative process was designed such that most complaints against police officers would be determined to be unfounded or not sustained. *Id.* The Third Circuit held that, even though the municipality had a system in place to investigate complaints against police officers, there was sufficient evidence for a jury to infer that the municipality had a policy or custom, based upon a pattern of violent and inappropriate behavior by a police officer consisting of five complaints of excessive force in less than five years by the offending police officer. *Id.* Of the five incidents that occurred, one transpired after the incident involving the plaintiff. *Id.* at 969–70. The Third Circuit stated that a subsequent incident "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force." *Id.* at 972; *see also Foley v. City of Lowell,* 948 F.2d 10, 14 (1st Cir.1991) (actions subsequent to an event are admissible if they provide valuable insight into the policy or custom at the time of the incident).

In this case, there were three (3) incidents involving Callahan in less than one year. There is no evidence of any independent investigation by the School District of any of these incidents. No disciplinary action was taken against Callahan. Even following Callahan's convictions of the summary offense of harassment in connection with his physical abuse of students, no disciplinary action was taken against Callahan. While Callahan's assault on Kurilla was preceded by only one incident, the failure to take any disciplinary action against Callahan following the three incidents in the span of less than one year is probative of the question of whether the School District had a policy or custom to

han appealed his conviction, but the appeal was dismissed by the Pennsylvania Superior Court. *Id.* at 50.

tolerate, or be deliberately indifferent to excessive use of force by teachers.

While the evidence in this case might not be as compelling as that found in *Beck,* our court of appeals' holding in *Beck* counsels that the existence of a custom or policy that condoned or was deliberately indifferent to excessive use of force by teachers in the Mid–Valley School District is a triable issue. Accordingly, Mid–Valley School District's motion for summary judgment will be denied.[11]

## III. CONCLUSION

For the foregoing reasons, Callahan's motion for partial summary judgment will be granted, Kurilla's motion for partial summary judgment will be denied, and the School District's motion will be denied. In light of this disposition, the court will retain pendent jurisdiction over Kurilla's state law claims against Callahan.

11. In light of this decision, there is no need to address at this time Kurilla's claim that the School District may be liable under a "state-created danger" theory. It should be noted, however, that there appears to be in this case substantial overlap in the elements necessary to establish liability under *Monell* and the "state-created danger" theory. In this regard, under both theories, plaintiff must establish deliberate indifference to the consequences of teacher violence.