Victoria **BISIGNANO** and Anthony **Bisignano, as the parents and best friends of Amanda Bisignano, an infant under the age of eighteen years of age, Plaintiffs,**

v.

**HARRISON CENTRAL SCHOOL DISTRICT and Vincent Nicita, individually, Defendants.**

**No. 99 Civ. 1644(WCC).**

United States District Court, S.D. New York.

Sept. 11, 2000.

---

Lovett & Gould, Kim Berg, of counsel, White Plains, for Plaintiffs.

Henderson & Brennan, Brian C. Henderson, of counsel, White Plains, for Defendant Harrison Central School District.

Law Offices of Andrew C. Quinn, Andrew C. Quinn, of counsel, White Plains, for Defendant Vincent Nicita.

*OPINION AND ORDER*

WILLIAM C. CONNER, District Judge.

Plaintiffs Victoria and Anthony Bisignano bring the instant action on behalf of their minor daughter Amanda Bisignano against defendants Harrison Central School District (the "District") and teacher Vincent Nicita. Plaintiffs claim that de- fendants falsely imprisoned Amanda, sub- jected her to excessive force, and deprived her of her property in violation of the Fourth and Fourteenth Amendments, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and New York State law. Plaintiffs also assert claims against defendants for negli- gence and intentional infliction of emotion- al distress. The District, claiming that Nicita's acts may not be imputed to it, now moves for summary judgment pursuant to Fed.R.Civ.P. 56(b). The District seeks dismissal of plaintiffs' complaint and Nici- ta's cross-claim against it, or, in the alter- native, an order removing this case to state court. Nicita also moves for sum- mary judgment and dismissal of plaintiffs' complaint, or, in the alternative, for remov- al to state court. For the reasons that follow, the District's motion for summary judgment is granted as to plaintiffs' feder- al law claims against it and plaintiffs' state law claims against the District are dis- missed for lack of subject matter jurisdic- tion. Defendant Nicita's motion for sum- mary judgment is granted as to plaintiffs' procedural and substantive due process claims, but in all other respects is denied. Defendant Nicita's cross-claim against the District is dismissed without prejudice.

## BACKGROUND

At the time of the events underlying the instant lawsuit, Amanda Bisignano was thirteen years-old and an eighth-grade stu- dent at Louis M. Klein Middle School in Harrison, New York. Amanda took a gym class taught by defendant Nicita every oth- er day. Nicita began working as a coach in the District in 1983, and as a physical education teacher in 1991.

On November 5, 1998, Amanda found a twenty-dollar bill on the floor of the gym- nasium. It was not money that she had dropped or lost. Amanda testified that she asked other students in class whether they had dropped the bill. Within seconds after she found the money, Nicita told her it was his. Nicita told Amanda that if she gave him the money, he would buy her

lunch. When Amanda failed to hand over the money, Nicita said "something like then get in the closet or something. He said like you're going to have to like stay in the closet until you give me back my money." (Bisignano Dep. at 45.) Amanda said she did not give Nicita the money because she thought he was joking when he said that it was his. (*Id.* at 91.) Nicita stated that he had a twenty-dollar bill in his pocket in the morning, but when he checked his pocket after he saw Amanda pick up the money from the floor, he realized his pocket was empty. (Nicita Dep. at 32.)

Amanda said that after Nicita dismissed the class, she ran out of the gymnasium laughing and Nicita ran after her. (Bisignano Dep. at 47.) Amanda testified that Nicita told her she could not leave until she returned the twenty-dollar bill to him and then he gave her "a little push" into an equipment closet. (*Id.* at 48.) Nicita testified during his deposition that he did not push Amanda into the closet, but that she ran into the closet herself. (Nicita Dep. at 53.)

Amanda testified that the doors to the closet were completely closed and there was no light inside the closet. (Bisignano Dep. at 52–53.) Nicita said he believed the lights were on. (Nicita Dep. at 59.) Amanda said she remained in the closet for slightly more than thirty seconds while Nicita held the doors shut from the other side. (Bisignano Dep. at 52–53.) Amanda said she demanded to be released from the closet, but Nicita told her he would not release her until she gave him the money. According to Amanda, Nicita, who was laughing, then opened the door about a foot, and Amanda slipped out.

Nicita remembered the incident differently. He testified that he pushed the door closed, then walked away from it. (Nicita Dep. at 60.) He said Amanda then exited the closet. (*Id.* at 62.)

Amanda testified that after she exited the closet, Nicita grabbed and twisted her left wrist, and yelled at her to give him back his twenty dollars. She said she screamed for help. Then, when she reached into her pocket to retrieve the bill, Nicita grabbed her upper right arm. (Bisignano Dep. at 54–59.) Amanda said she threw the bill, which glanced off Nicita's chest and fell to the ground. Nicita told her to pick up the bill and hand it to him "like a human being." (*Id.* at 60.) Nicita testified that when Amanda left the closet, she was holding the bill in her hand. (Nicita Dep. at 79.) He said he "just held her hand as it was there," (*id.* at 75), and that he held her hand "[t]ight enough so that she couldn't get away, but not that tight," (*id.* at 81). Nicita said Amanda threw the bill on the floor, and he told her to pick it up and hand it to him. (*Id.* at 80.)

Amanda said she ran out of the room and went into the girls' locker room where she showed her friends the red marks on her arms. She was crying. (Bisignano Dep. at 64.) She then went to the nurse's office, where the nurse put ice packs on her arms. Ann Doniger, a health assistant, testified that Amanda's arm was "slightly red" near her wrist. (Doniger Dep. at 15.)

Nicita came to the nurse's office and asked Amanda to take a walk with him. Amanda said they went to Nicita's office and Nicita apologized and told her that he did not mean to hurt her. (Bisignano Dep. at 63.) Rosemary Brooke, the principal of the middle school, said that when Amanda came to her office following the incident, Amanda had marks on her upper arm and wrist. (Brooke Dep. at 151.) Brooke described Amanda's injuries as "slight." (*Id.* at 154.) Brooke telephoned Amanda's parents and Amanda chose to spend the rest of the day in school rather than go home. Brooke testified that she reported the incident to the District superintendent. Subsequently, the principal and superintendent met with plaintiffs and Nicita.

Amanda states she had "many" sessions with a psychologist following the incident. (Bisignano Dep. at 29.) Amanda com-

plained of frequent stomach aches and headaches, although Amanda testified she had suffered from migraine headaches prior to the incident. (*Id.* at 31–34.)

In her deposition, Amanda testified that during the spring 1998 softball season, Nicita, who was her coach, told her that "we should do the batting order by my I.Q. and instead of playing I should bring a pillow so I can sit on it." (*Id.* at 11.)

Brooke testified that other students had incidents with Nicita. Brooke said that a memorandum in her correspondence file reported that Nicita, "in correcting an incident in the locker room[,] ... said to [a student] you were a little faggot, I should lock you in the room to have someone beat your ass." (Brooke Dep. at 8.) Brooke said she did not speak with Nicita about the incident and did not report the incident to the District superintendent. (*Id.* at 11.) Brooke also testified that a May 1997 document made "reference to a youngster who reported to the nurse that he had a sore arm," and that "Mr. Nicita twisted his arm to take candy from him, area slightly red, ice applied." (*Id.* at 15.) In a 1992 memorandum from Brooke to Nicita, Brooke reprimanded Nicita for telling a student, "You turn me on." (Berg Aff., Ex. 33.)

Brooke testified that during her tenure as principal, the District provided teachers with a handbook and at times invited speakers to discuss "being sensitive to the kids" with faculty, but did not offer training focused on disciplining students or interpersonal skills. (Brooke Dep. at 12–13, 114.)

## DISCUSSION

### I. *Summary Judgment Standard*

A district court may grant summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). The party seeking summary judgment has the burden of showing that no genuine factual dispute exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

### II. *Plaintiffs' Claims Against Nicita*

Plaintiffs claim that defendant Nicita falsely imprisoned Amanda, subjected her to excessive force and deprived her of her property in violation of her Fourth and Fourteenth Amendment rights, as made actionable by the Civil Rights Act of 1871, 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Not every state law tort becomes an actionable constitutional tort under section 1983 simply because it was committed by a state actor. *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979). Thus, our initial inquiry is whether the alleged actions, if taken as true, deprived Amanda Bisignano of a constitutional right. *See Albright v.*

*Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) ("The first step in any [section 1983] claim is to identify the specific constitutional right allegedly infringed.").

### A. *Plaintiffs' Fourth Amendment Claim*

Plaintiffs claim that Nicita violated Amanda's Fourth Amendment rights, as applied to the states by the Fourteenth Amendment, by forcibly confining her in the storage closet. The Fourth Amendment guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures" of the person.

In a case in which two Florida junior high school students complained of being paddled by their teachers—one to the point of suffering a hematoma requiring medical attention, and the other paddled on the arm so that he lost use of it for a week—the Supreme Court noted in dictum that "the principal concern of [the Fourth] Amendment's prohibition against unreasonable searches and seizures is with intrusions on privacy in the course of criminal investigations." *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414 n. 42, 51 L.Ed.2d 711 (1977). However, in a later case, the Court addressed the issue of whether a school administrator violated a student's Fourth Amendment rights when he searched her purse and found evidence that led to the student's adjudication of delinquency. *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). The Court determined that the Fourth Amendment applies to searches conducted by school authorities, but stated that the determination of the standard of reasonableness "depends on the context within which a search takes place." *T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 740.

The Court, weighing a child's interest in privacy with "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds" held that the legality of a search of a student "should depend simply on the reasonableness, under all the circumstances, of the search." 469 U.S. at 339, 341, 105 S.Ct. at 741–42. The Court set forth a twofold reasonableness inquiry: first, the court must consider whether the action was "justified at its inception," and second, the court must determine whether the action, as it actually transpired, was "reasonably related in scope to the circumstances which justified the interference in the first place." 469 U.S. at 341, 105 S.Ct. at 742–43 (internal citations and quotations omitted).

The *T.L.O.* Court did not address the specific question at issue here: whether the Fourth Amendment applies to the "seizure" of a student's person by a public schoolteacher. We did not find, and the parties did not present to the Court, any Second Circuit decisions on point with the facts of this case. However, several other circuits have held that the Fourth Amendment applies to such situations, and have adopted the relaxed standard articulated in *T.L.O.* to determine whether the seizure was lawful.

The Tenth Circuit applied the *T.L.O.* test to determine whether a school official who interrogated a student for twenty minutes regarding a bomb threat made against a junior high school violated the student's Fourth Amendment rights. *Edwards v. Rees,* 883 F.2d 882, 884 (10th Cir.1989). The court found that the questioning was "justified at its inception" by statements from other students implicating the plaintiff and that the twenty-minute questioning was "reasonably related in scope to determining whether he had indeed called in the bomb threat." *Id.*

Like the Tenth Circuit, the Seventh Circuit held that seizure of a student by a public school official implicates the Fourth Amendment, but "only when the restriction of liberty is unreasonable under the circumstances then existing and apparent." *Wallace v. Batavia Sch. Dist.,* 68 F.3d 1010, 1014 (7th Cir.1995). The Seventh Circuit noted that "[d]epending on the cir-

cumstances, reasonable action may certainly include the seizure of a student in the face of provocative or disruptive behavior." *Id.* In that case, a teacher returned to his classroom after a few minutes' absence to find two females students screaming at one another. The teacher ordered one of the students out of the room and when she failed to move quickly, he reached across a desk and grasped her by the left wrist to speed her exit out of the classroom. As the teacher pulled the student, she bent over the desk and he grasped her right elbow, but released her after the student stopped her movement and told him to let her go. *See id.* at 1011. The *Wallace* court determined that the teacher did not violate the student's Fourth Amendment rights, as the facts simply showed "a teacher doing what he thought best to break up a fight so that some modicum of an educational atmosphere could prevail." *Id.* at 1015.

The Fifth Circuit has likewise held that the Fourth Amendment extends to seizures of public school students by school officials, and that the *T.L.O.* test determines the reasonableness of the seizure. *See Hassan v. Lubbock Indep. Sch. Dist.,* 55 F.3d 1075, 1079 (5th Cir.1995), *cert. denied,* 516 U.S. 995, 116 S.Ct. 532, 133 L.Ed.2d 438 (1995). There, the court held that teachers who directed a probation officer at a juvenile detention facility to lock a misbehaving sixth grader in an intake room during a field trip to the detention center did not violate the student's Fourth Amendment rights. *Id.* at 1080. The court, applying the two-part *T.L.O.* test, stated that the seizure was reasonably justified at its inception because it "properly furthered the mandated maintenance of discipline ˑwithin the touring group, thus making it possible for the other students to continue their valuable educational experience." *Id.* The court further held that placing the student in the intake room was "reasonably related in scope to the relevant circumstances," as the student was both protected from inmates at the detention center and easily

supervised and the restriction lasted no longer than necessary. *Id.*

■ The Ninth Circuit read *T.L.O.*'s holding as limited to cases in which the search or seizure was "somehow designed to elicit a benefit for the government in an investigatory or, more broadly, an administrative capacity." *United States v. Attson,* 900 F.2d 1427, 1429 (9th Cir.1990), *cert. denied,* 498 U.S. 961, 111 S.Ct. 393, 112 L.Ed.2d 403 (1990). However, as the *T.L.O.* Court recognized, "[i]n carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State ...." *T.L.O.,* 469 U.S. at 336, 105 S.Ct. at 740; *see also Wallace,* 68 F.3d at 1013 (actions of teacher who grabbed student by the wrist and elbow to maintain classroom control could be characterized as "an administrative function designed to effectuate school policies and standards"). Accordingly, we do not find *Attson* a bar to following the decisions of the Tenth, Seventh and Fifth Circuits. We hold that the incident alleged by plaintiffs constitutes a "seizure" pursuant to the Fourth Amendment, and that the *T.L.O.* test guides the analysis of whether the "seizure" was reasonable.

The *T.L.O.* reasonableness test reflects a balancing of the need to guard against arbitrary invasions of a student's privacy and security with "the value of preserving the informality of the student-teacher relationship" and the necessity of maintaining order in our schools. *See T.L.O.,* 469 U.S. at 338–40, 105 S.Ct. at 741–42.

■ In applying that test to the facts of this case, we must first consider whether Nicita's alleged actions were "justified at [their] inception," and second, whether his actions were "reasonably related in scope to the circumstances which justified the interference in the first place." 469 U.S. at 341, 105 S.Ct. at 742–43 (internal citations and quotations omitted). Looking at the facts in the light most favorable to Amanda, as we must on a motion for sum-

mary judgment, we find that material issues of fact exist which preclude a grant of summary judgment for Nicita on this claim.

Both parties agree that Nicita's actions took place after class was dismissed. Certainly, a teacher may elect to discipline a student after class to minimize the disruption to other students. Furthermore, a teacher may be justified in demanding the return of money he lost if he reasonably believed it was his. However, a reasonable jury could find that the loss of a twenty-dollar bill did not justify pushing a thirteen-year-old girl into an unlit closet and holding the doors closed from the other side, even if, as Amanda admitted in her deposition, she was running from the teacher at the time. Likewise, a reasonable jury could conclude that Nicita's alleged actions were not "reasonably related in scope to the circumstances" under which the incident arose.

We certainly hesitate to allow "a federal case" to be made of an incident that lasted only a few moments. We appreciate the benefits of a certain level of familiarity between students and teachers and the daunting task teachers have in maintaining discipline in the classroom. However, a teacher who uses the power of his authority to pursue his financial interest gains abuses the trust placed in him by his charges, their parents and the state. Defendant Nicita's motion for summary judgment as to plaintiffs' Fourth Amendment claim is denied.

### B. *Plaintiffs' Substantive Due Process Claims*

■ Plaintiffs claim that Nicita's conduct toward Amanda violated her right to substantive due process. This claim must be dismissed.

As an initial matter, we note that the Supreme Court has held:

Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular

sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright*, 510 U.S. at 273, 114 S.Ct. at 813 (plurality opinion of Rehnquist, C.J.) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)).

The Second Circuit dismissed a substantive due process claim brought by the parents of a child who was removed from school by protective workers and subjected to a medical examination. *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir.1999), cert. denied, —— U.S. ——, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). The court held that:

Sarah's removal and her examination constituted a seizure and search, respectively, under the Fourth Amendment and the Tenenbaums have standing to assert a Fourth Amendment-based claim against the defendants on Sarah's behalf. Their claim on Sarah's behalf therefore must be analyzed under the standard appropriate to [the Fourth Amendment], not under the rubric of substantive due process.

*Id.* (citations omitted).

The Supreme Court has stated that not all constitutional claims relating to physically abusive conduct arise under either the Fourth or Eighth Amendments, but "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272, 117 S.Ct. 1219, 1228 n. 7, 137 L.Ed.2d 432 (1997).

At least one other district court found, in the wake of *T.L.O.*, that the momentary use of force by a teacher against a student should be judged not pursuant to the Fourth Amendment reasonableness standard, but as a potential violation of sub-

stantive due process. *Kurilla v. Callahan*, 68 F.Supp.2d 556 (M.D.Pa.1999). There, a student got into a fight with another student. A teacher called both students to his desk and asked them what happened. One of the students interrupted the other to explain his side of the story and the teacher told the student to "[s]hut up or I will lay you out on the floor." *Id.* at 557. When the student persisted with telling his side of the story, the teacher grabbed the student's shirt with clenched fists and pulled the student hard, causing the student's chest to come into contact with his fists. The court held that the teacher's actions did not effect a "seizure" of the student under the Fourth Amendment. Instead, the court applied the "shocks the conscience" standard used to determine whether a student's substantive due process rights were violated. *Id.* at 563.

However, the *Kurilla* case is distinguishable from the one at bar. Here, Amanda claims that she was forcibly detained in a closet, while *Kurilla* was a simple case of a teacher's use of force. In fact, the *Kurilla* court acknowledged that, with the exception of the Seventh Circuit's decision in *Wallace* in which a teacher grabbed a student by the elbow and wrist, most of the cases in which courts applied the Fourth Amendment in the school discipline context "involved factual scenarios more closely aligned with Fourth Amendment protection." *Kurilla*, 68 F.Supp.2d at 562.

To the extent that plaintiffs could bring a separate claim regarding Nicita's alleged use of force against Amanda, *i.e.*, grabbing and twisting her wrist and, considering the possibility that we have erred in our conclusion that the instant case arises under the Fourth Amendment, we will examine the facts alleged in the context of substantive due process.

In *Ingraham*, the Supreme Court held that corporal punishment in public schools implicates a constitutionally protected liberty interest where "school authorities, acting under color of state law, deliberate-ly decide to punish a child for misconduct by restraining the child and inflicting appreciable physical pain." 430 U.S. at 674, 97 S.Ct. at 1414. *De minimis* impositions do not implicate the Fourteenth Amendment. *Id.*

The Court left open the question whether the infliction of severe corporal punishment on schoolchildren violates substantive due process. *Ingraham*, 430 U.S. at 659, 97 S.Ct. at 1406 n. 12. Examining the issue of whether corporal punishment violates a student's right to procedural due process, the Court held that "traditional common law remedies are fully adequate to afford due process." 430 U.S. at 672, 97 S.Ct. at 1413.

In the wake of *Ingraham*, some federal courts have held that claims of substantive due process violations resulting from the exercise of corporal punishment are foreclosed where the state affords the student adequate post-punishment remedies. *See, e.g., Harris v. Tate County Sch. Dist.*, 882 F.Supp. 90 (N.D.Miss.1995); *Carestio v. Sch. Bd. of Broward County*, 79 F.Supp.2d 1347, 1349 (S.D.Fla.1999). Other courts have found that a student who has been subjected to corporal punishment may make out a claim for a violation of her substantive due process rights regardless of the availability of state law remedies. *See, e.g., Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980); *Meyer by Wyrick v. Litwiller*, 749 F.Supp. 981 (W.D.Mo.1990). These courts apply the test articulated by the Second Circuit in *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.1973), overruled on other grounds by *Graham*, or a version thereof, to determine whether a school official's actions "shock the conscience." The "shocks the conscience" standard has been adhered to as the benchmark for cognizable abuse of official power since it was first articulated by the Supreme Court in *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). *See Sacramento v. Lewis*, 523 U.S. 833, 846–47, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043 (1998).

The *Johnson* test provides that a court must look to such factors as:

> the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

481 F.2d at 1033. *See also Hall,* 621 F.2d at 613 ("[T]he substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a careless or unwise exercise of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."); *Meyer,* 749 F.Supp. at 985 (student plaintiff may recover for constitutional violations if plaintiff's evidence permits fact-finder to conclude force applied by teacher was so disproportionate to need for discipline and so inspired by malice that teacher's behavior shocked the conscience); *Webb,* 828 F.2d at 1158 (school principal who, during a school trip, broke down the locked door to a hotel bathroom, hitting a student who had locked herself inside, and who then threw that student against a wall and slapped her may have violated the student's substantive Fourteenth Amendment due process rights).

Here, even if we assume that the facts alleged by plaintiffs are true, Nicita's actions do not "shock the conscience" of the Court. Amanda did not suffer the kind of "appreciable physical pain" which implicates the Fourteenth Amendment. *See Ingraham,* 430 U.S. at 674, 97 S.Ct. at 1414. At most, her physical injuries amounted to red marks on her arms, stomach upset and headaches. Although we can appreciate how such an altercation with a teacher could cause substantial embarrassment to Amanda and Amanda testified to having seen a psychologist several times following the incident, these injuries

were not "so severe" that substantive due process rights were implicated. *Webb,* 828 F.2d at 1158.

Defendant Nicita's motion for summary judgment as to plaintiffs' substantive due process claim is granted.

**C. *Plaintiffs' Deprivation of Property Claim***

Plaintiffs claim that Amanda was deprived of procedural due process when Nicita "robbed her, both figuratively and literally" of the opportunity to comply with state law provisions as to found money (Pls. Mem. Opp. Summ. J. at 29), is without merit and will be dismissed.

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). To have a protectable property interest, a person must have "a legitimate claim of entitlement" to the property as defined by state law. 408 U.S. at 576, 92 S.Ct. at 2709. Generally, the existence of a federally-protected property right is an issue of law for the court. *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999). The claim is not supported merely by proof that an individual did not receive what they were entitled to under state law; rather, the "denial must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.'" *Id.* at 262.

Pursuant to New York State law, "[a]t the time property is found, the finder acquires no right to the property. All he has is an expectation, which may ripen into a possessory right at the end of the prescribed time period, provided that the owner has not come forward and that the finder makes a demand therefor." *Fuentes v. Wendt,* 106 Misc.2d 1030, 1033, 436 N.Y.S.2d 801 (N.Y.Sup.Ct.1981).

On November 5, 1998, Amanda had no more than an expectation. New York law provides that:

> any person who finds lost property of the value of twenty dollars or more or comes into possession of property of the value of twenty dollars or more with knowledge that it is lost property or found property shall, within ten days after the finding or acquisition of possession thereof, either return it to the owner or report such finding or acquisition of possession and deposit such property in a police station or police headquarters of the city where the finding occurred or possession was acquired . . . .

N.Y. Pers. Prop. Law § 252.

Amanda would not have acquired a possessory right to the twenty-dollar bill until after the statutory three-month period had expired. *See id.* §§ 253(7), 254(2). Her rights as they existed on November 5, 1998 do not support the application of due process requirements. Accordingly, defendant Nicita's motion for summary judgment as to plaintiffs' procedural due process claim is granted.

### III. *Plaintiffs' Claims against the District*

Section 1983 applies to municipalities and other local government units. *Monell v. Department of Soc. Servs. of the City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). However, section 1983 will not support a cause of action based upon respondeat superior liability. 436 U.S. at 694, 98 S.Ct. at 2037; *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981). A municipality will be liable for a violation of section 1983 only where the municipality itself was the "moving force" behind the plaintiff's deprivation of federal rights. *Board of the County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 400, 117 S.Ct. 1382, 1386, 137 L.Ed.2d 626 (1997). A municipality will not be held liable solely because it employs a tortfeasor. 520 U.S. at 403, 117 S.Ct. at 1388. The plaintiff must show that her injuries were a result of a municipal "policy" or "custom." *Id.*

"A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993). In cases in which a plaintiff does not claim that a municipality directly inflicted an injury, but nonetheless caused an employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *County Comm'rs of Bryan County,* 520 U.S. at 405, 117 S.Ct. at 1389. The Supreme Court has held that a municipality will be liable for inadequate training or supervision of its employees "only where the failure to train amounts to deliberate indifference to the rights" of those with whom municipal employees will come into contact. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

Plaintiffs allege that the District, "aware of Nicita's violent and aggressive behavior, has deliberately and/or recklessly taken no remedial and/or no effective remedial action as a result of which Nicita's said propensities have been encouraged, condoned and/or ratified by the District." (Complt. ¶ 7.) In their brief in opposition to defendants' motions, plaintiffs claim that the District had a custom or policy of failing to take remedial action "with respect to reports of physically abusive behavior by Nicita towards students at the District's Middle School," (Pls. Mem. Opp. Summ. J. at 39), and that the District failed to train its employees and supervisors regarding appropriate conduct toward and discipline of students, (*id.* at 40).

The Second Circuit set forth the following three-part test for determining when a municipality's failure to train or supervise

rises to the level of "deliberate indifference":

> First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation.... Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.... [Third], the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Walker v. City of New York,* 974 F.2d 293, 297 (2d Cir.1992) (internal citations omitted).

■■■ In the instant case, plaintiffs have offered three documented incidents other than that at bar in which Nicita behaved inappropriately with a student: one case in which Nicita called a student "a little faggot" and told him "I should lock you in the room to have someone beat your ass;" another in which Nicita twisted a student's arm to take candy from him, causing the student's arm to turn "slightly red;" and a third in which Nicita told a student "You turn me on."[1] Plaintiffs also offered evidence that the District did not provide teachers and staff training specifically targeted to disciplinary procedures and interpersonal skills.

This evidence is insufficient to impose liability, vicariously or directly, upon the District for any constitutional deprivation. There is no evidence the District condoned the activity of which Nicita is accused, nor is there any evidence that the District specifically directed, supervised, participat-

ed, authorized, or even knowingly acquiesced in the incident upon which the claim for relief is based. Plaintiffs have not demonstrated that the District knew "to a moral certainty" that the alleged incident was likely to take place. Defendant Nicita might have demonstrated questionable judgment on several occasions, but failure to address those events in a more comprehensive fashion does not lead us to conclude that the District was deliberately indifferent to the constitutional rights of Nicita's students. Accordingly, summary judgment is granted to defendant District as to plaintiffs' federal law claims against it. Plaintiffs' claims against the District arising under state law are dismissed without prejudice for lack of subject matter jurisdiction.

## IV. *Qualified Immunity*

None of the parties disputes that Nicita, as a state actor, possesses qualified immunity. Qualified immunity shields state actors from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Brown v. D'Amico,* 35 F.3d 97, 99 (2d Cir.1994); *see also Walker v. McClellan,* 126 F.3d 127, 129 (2d Cir.1997); *Davidson v. Scully,* 114 F.3d 12, 14 (2d Cir.1997); *Gardiner v. Incorporated Village of Endicott,* 50 F.3d 151, 156 (2d Cir.1995).

A court evaluating a claim of qualified immunity "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of

---

**1.** Plaintiffs have offered hearsay evidence as to other alleged incidents between Nicita and students. Hearsay evidence may not be considered in deciding a motion for summary judgment. *See* Fed.R.Civ.P. 56(e) ("Support-

ing and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (internal citation and quotations omitted).

"Clearly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (internal citation omitted); *see also Wilson*, 526 U.S. at 614–15, 119 S.Ct. at 1700.

It is well settled that children do not "shed their constitutional rights ... at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), although "the nature of those rights is what is appropriate for children in school." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). As discussed, *supra*, in Part II.A., the Supreme Court held in 1985 that public school officials are subject to the strictures of the Fourth Amendment. *T.L.O.*, 469 U.S. at 336–37, 105 S.Ct. 733. The issue at this stage of the analysis is the more specific, "objective inquiry" of whether a reasonable public school teacher could have believed that confining a student in an unlit storage closet during an encounter after class had ended "was lawful, in light of clearly established law and the information [the teacher] possessed." *Wilson*, 526 U.S. at 615, 119 S.Ct. at 1700.

We hold that material issues of fact preclude a grant of summary judgment to defendant Nicita on the issue of qualified immunity. No reasonable school official could have believed that the conduct Amanda described was lawful. The dearth of Supreme Court and Second Cir-

cuit decisions squarely on point with the facts of this case is likely a function of the aberrational quality of the alleged acts, and cannot serve to shield a teacher from the consequences of confining a student in a closet. *See Wilson*, 526 U.S. at 621, 119 S.Ct. at 1702 (Stevens, J., concurring in part and dissenting in part) ("The absence of judicial opinions expressly holding that police violate the Fourth Amendment if they bring media representatives into private homes provides scant support for the conclusion that in 1992 a competent officer could reasonably believe that it would be lawful to do so."). Accordingly, we deny defendant Nicita summary judgment on the issue of qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court grants the defendant District's motion for summary judgment as to plaintiffs' federal law claims and declines to exercise supplemental jurisdiction over plaintiffs' state law claims against the District. Defendant Nicita's cross-claim against the District is dismissed without prejudice and may be refiled in the event that Nicita is adjudged liable. In addition, the Court grants Nicita's motion for summary judgment as to plaintiffs' claim that Nicita violated Amanda's substantive and procedural due process rights. In all other respects, Nicita's motion for summary judgment is denied.

SO ORDERED.