**JIE YIN, Plaintiff,**

v.

**NFTA and NFTA Police Officer Victor Alvarado, Defendants.**

**1:11-CV-00780 EAW**

United States District Court,
W.D. New York.

Signed May 19, 2016

Anna Marie Richmond, Buffalo, NY, for Plaintiff.

Vicky-Marie Brunette, Niagara Frontier Transportation Authority, Buffalo, NY, for Defendants.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

### INTRODUCTION

This case involves an attempted bus trip from Buffalo to Niagara Falls that went

awry over a 55 cent fare dispute, and according to the plaintiff, ended up with a serious violation of her constitutional rights. Plaintiff Jie Yin ("Plaintiff"), represented by counsel, brings this action pursuant to 42 U.S.C. § 1983, against Defendants Niagara Frontier Transportation Authority ("NFTA") and NFTA Police Officer Victor Alvarado (collectively "Defendants"). Plaintiff contends that her efforts to travel from Buffalo to Niagara Falls by bus on September 22, 2008, were abruptly thwarted when Officer Alvarado violently and forcibly removed her from an NFTA bus following a fare dispute and then proceeded to unlawfully detain Plaintiff at the bus terminal.

Presently before the Court is Defendants' motion for summary judgment. (Dkt. 53). Because there are disputed issues of material fact with respect to Plaintiff's excessive use of force and unlawful seizure/detention claims asserted against Officer Alvarado pursuant to 42 U.S.C. § 1983, the motion for summary judgment is denied with respect to Officer Alvarado. On the other hand, this record does not support Plaintiff's allegations that NFTA maintains an unlawful policy of permitting its employee officers to engage in excessive uses of force without repercussion, and therefore, summary judgment is warranted in favor of NFTA.

## PROCUDURAL BACKGROUND

On September 16, 2011, Plaintiff commenced this action *pro se*, seeking relief under 42 U.S.C. § 1983 against the "NFTA Police," "NFTA Police Department," and "NFTA" (Niagara Frontier Transportation Authority). (Dkt. 1). The Court granted Plaintiff leave to proceed *in forma pauperis* on September 16, 2011, dismissed Plaintiff's claims against the NFTA Police and Police Department with prejudice, granted Plaintiff leave to file an amended complaint against the unnamed NFTA Police Officer, and directed Plaintiff to file an amended complaint against NFTA setting forth the actions of the NFTA Police Officer that were allegedly performed pursuant to a policy or custom of the NFTA. (Dkt. 4).

On October 18, 2011, Plaintiff filed an amended complaint against NFTA, "John Doe (NFTA Police Badge No. 50)," and "John Doe 2 (NFTA Driver of Bus No. 40)." (Dkt. 5). Plaintiff filed a second amended complaint on October 21, 2011 (Dkt. 6), and a third amended complaint on November 16, 2011 (Dkt. 7). On May 10, 2012, the Court deemed the Second Amended Complaint and Third Amended Complaint together as the operative pleading in this matter. (Dkt. 8 at 2). The Court dismissed Plaintiff's claims pursuant to the Americans with Disabilities Act and Rehabilitation Act with prejudice, and also dismissed claims against Defendant John Doe 2 with prejudice. (*Id.* at 9). Additionally, the Court directed NFTA to provide the name of the John Doe Police Officer and ordered that Plaintiff's complaint be amended to reflect the proper name of the John Doe Defendant. (*Id.*). On June 6, 2012, NFTA identified NFTA Police Officer Victor Alvarado as the John Doe Defendant.

Defendant NFTA filed an answer on June 25, 2012 (Dkt. 9), and Defendant Alvarado filed an answer on November 30, 2012 (Dkt. 22). The case proceeded to discovery under the supervision of Magistrate Judge Leslie G. Foschio. (Dkt. 21).

On January 30, 2015, the case was transferred to the undersigned. (Dkt. 36). After two status conferences before the Court, Plaintiff's counsel orally moved to withdraw as counsel from the case. (Dkt. 40). On April 21, 2015, the Court granted that motion and stayed discovery while Plaintiff sought new counsel. (Dkt. 41). On June 25,

2015, the Court lifted the stay of discovery and set deadlines for discovery and the filing of dispositive motions, to be completed under the supervision of the undersigned. (Dkt. 44).

On October 22, 2015, the Court appointed Anna Marie Richmond, Esq. to represent Plaintiff *pro bono* in this case at Plaintiff's and Ms. Richmond's request. (Dkt. 47). The parties engaged in additional discovery (Dkt. 50, 52), and on February 1, 2016, Defendants filed a motion for summary judgment (Dkt. 53). Plaintiff responded to the motion on February 22, 2016 (Dkt. 59), Defendants filed their reply papers on February 29, 2016 (Dkt. 67), and on April 5, 2016, the Court held oral argument on the motion (Dkt. 58).

Following the oral argument on April 5, 2016, the Court granted the parties an opportunity to submit letters citing to relevant case law on the issue of NFTA's *Monell* liability. Each party further addressed the issue in letters dated April 11, 2016, and April 12, 2016, at which time the Court took the motion for summary judgment under advisement.

## FACTUAL BACKGROUND

Plaintiff lives in Buffalo, New York. (Dkt. 54 at ¶ 1; Dkt. 59 at ¶ 1). Defendant NTFA is a public benefit corporation existing under New York State law. (Dkt. 54 at ¶ 3; Dkt. 59 at ¶ 3). Defendant Victor Alvarado had been an NFTA Police Officer for approximately 29 years employed as a Patrolman as of September 22, 2009. (Dkt. 54 at ¶ 4; Dkt. 59 at ¶ 4).

On September 22, 2008, Plaintiff intended to travel from Buffalo to Niagara Falls by bus. (Dkt. 54 at ¶ 21; Dkt. 59 at ¶ 21). She was traveling alone and had several items with her, including a bag, a jacket, and her walker. (Dkt. 54 at ¶ 25; Dkt. 59 at ¶ 25). Plaintiff had used NFTA Metro buses many times before September 22, 2008.

(Dkt. 54 at ¶¶ 2, 22; Dkt. 59 at ¶¶ 2, 22). Plaintiff took an NFTA bus from her home in Buffalo to the main bus station in downtown Buffalo, at the corner of Ellicott and North Division streets. (Dkt. 54 at ¶ 23; Dkt. 59 at ¶ 23). For this portion of her trip, Plaintiff paid with quarters and received a transfer. (Dkt. 54 at ¶ 24; Dkt. 59 at ¶ 24). The fare to travel from downtown Buffalo to Niagara Falls was 45 cents. (Dkt. 54 at ¶ 26; Dkt. 59 at ¶ 26). Plaintiff claims that she was not aware of the amount of the additional charge associated with the transfer until she boarded the Number 40 bus at the downtown Buffalo bus station. (Dkt. 59 at ¶ 26). To pay the 45 cent fare, Plaintiff fed a paper dollar bill into the fare box. (Dkt. 54 at ¶ 27; Dkt. 59 at ¶ 27). Plaintiff contends she asked the driver if a one dollar bill was okay, and was instructed to "put it in." (Dkt. 59 at ¶ 27).

While Plaintiff was paying her fare, there were passengers already on the bus, and three or four passengers standing outside of the bus behind her. (Dkt. 54 at ¶¶ 28-29; Dkt. 59 at ¶¶ 28-29). After she put her dollar bill in the fare box, Plaintiff thought that the fare box would dispense 55 cents in change. (Dkt. 54 at ¶ 30; Dkt. 59 at ¶ 30). The bus driver told Plaintiff that the fare box did not dispense change. (Dkt. 54 at ¶ 31; Dkt. 59 at ¶ 31). Plaintiff claims that she "politely" asked the driver how to make change come out of the machine, and that the driver said "very loudly no change," repeated the words "no change" twice, and laughed at her. (Dkt. 59 at ¶ 31). Plaintiff estimates that she was speaking to the bus driver about the request for change for not more than three minutes. (Dkt. 54 at ¶ 32; Dkt. 59 at ¶ 32).

The bus driver called for assistance from the NFTA Transit Police, claiming that Plaintiff was harassing and screaming at him, and indicating that he did not want

Plaintiff to ride his bus. (Dkt. 54 at ¶¶ 33-34; Dkt. 59 at ¶¶ 33-34). Plaintiff denies that she was screaming, and claims that the driver yelled at her. (Dkt. 59 at ¶ 34).

Defendant Alvarado was assigned to the main bus station on September 22, 2009. (Dkt. 54 at ¶ 35; Dkt. 59 at ¶ 35). As a Patrolman for the NFTA Police Department, Defendant Alvarado received various training including academy training, use of force training, Dale Carnegie training, a sensitivity program for dealing with passengers and the public, and other training. (Dkt. 54 at ¶ 37; Dkt. 59 at ¶ 37). Defendant Alvarado responded to the call at bus number 40. (Dkt. 54 at ¶ 39; Dkt. 59 at ¶ 39). It took Defendant Alvarado approximately 30 seconds to get from his office to Gate 14, where Plaintiff's bus was located, to investigate the fare dispute. (Dkt. 54 at ¶ 41; Dkt. 59 at ¶ 41).

Defendant Alvarado claims that when he arrived at the scene, Plaintiff was standing next to the bus driver and looked "a little irate." (Dkt. 54 at ¶ 42). He asked the bus driver what was going on, and the bus driver stated that Plaintiff had put extra money into the cashbox and was demanding that she get her change back. (Id. at ¶¶ 43-45). According to Defendant Alvarado, he explained to Plaintiff that the bus driver did not have keys to get into the box to provide change. (Id. at ¶ 48).

Plaintiff disputes that she was irate with the bus driver. (Dkt. 59 at ¶ 42). She claims she told the bus driver that she was disabled and entitled to a reduced fare, and that the bus driver laughing at her was "not a good way to do business." (Id.). Plaintiff alleges that she had "given up, concluding that she was not going to get her change, and had decided to take a seat," when Defendant Alvarado arrived at the scene. (Id. at ¶¶ 42-44). Plaintiff contends Defendant Alvarado and the bus driver did not have a conversation in front

of her, but rather, Defendant Alvarado told Plaintiff it was her fault that she had overpaid and ordered her to leave the bus. (Id. at ¶ 44). Plaintiff also disputes that Defendant Alvarado ever tried to explain the situation to Plaintiff. (Id. at ¶ 48).

Defendant Alvarado claims that there were several people waiting to board the bus, and that people outside of the bus stated they were going to be late for work. (Dkt. 54 at ¶¶ 51-53). Plaintiff disputes this version of events. (Dkt. 59 at ¶¶ 51-53).

According to Defendant Alvarado, he told Plaintiff that she needed to take a seat and call customer service to follow procedures to get her money back. (Dkt. 54 at ¶ 54). Plaintiff refused to take a seat and "verbalized that she was not going to go sit down and that she wanted her money." (Id. at ¶¶ 56-58). Defendant Alvarado told Plaintiff that she needed to either take a seat or get off the bus, and Plaintiff refused to do either until she got her money. (Id. at ¶¶ 58-60). At that time, Defendant Alvarado claims he took Plaintiff's walker and put it outside the bus, walked back onto the bus, and escorted Plaintiff by her left arm out of the door. (Id. at ¶¶ 61-62).

Plaintiff claims that when Defendant Alvarado told her to get off the bus, she asked if she could explain the situation to him, and he did not allow her to explain, but rather, threw her walker off the bus and pulled Plaintiff backwards down the steps of the bus. (Dkt. 59 at ¶¶ 54-63). Defendant Alvarado twisted Plaintiff's arm behind her back, forced her through the bus station door, threatened that if she called for help she would be arrested, and then dragged her into a small room. (Id. at ¶ 64). According to Plaintiff, when they got to the small room, Defendant Alvarado "shook her, pushed her into a chair, hit her on the back and spine with the palm of his hand, hit her left hand with the handcuffs, handcuffed her left hand to the arm of the

chair, and then left the room without saying anything to her." (*Id.* at ¶ 68).

Defendant Alvarado claims that he escorted Plaintiff to the building and sat her down inside Gate 14, then retrieved Plaintiff's walker and brought it back to her, and tried to explain to Plaintiff the procedures for getting her money back. (Dkt. 54 at ¶¶ 64-68). He claims Plaintiff became irate, and he told her that she needed to calm down and stop making a scene, or she would be arrested. (*Id.* at ¶¶ 69-70). When Plaintiff did not calm down, Defendant Alvarado alleges that he walked Plaintiff to the police office/substation inside the bus terminal building, where he again explained to Plaintiff what she needed to do to get her money back and provided his police card, offering to verify that Plaintiff had in fact overpaid the fare. (*Id.* at ¶¶ 71-74). Then, Defendant Alvarado testified, Plaintiff "became very loud and even to the point where she started screaming." (*Id.* at ¶ 76). Defendant Alvarado then handcuffed Plaintiff on one hand. (Dkt. 54 at ¶ 77; Dkt. 59 at ¶ 77). Defendant Alvarado denies striking Plaintiff or physically harming her in any way. (Dkt. 54 at ¶¶ 94, 96). Plaintiff slipped out of the handcuff, took her walker, and walked outside, where she called 911. (*Id.* at ¶¶ 80, 84).

Plaintiff alleges a different version of events. According to Plaintiff, she was "very frightened and was crying." (Dkt. 59 at ¶¶ 76-77). She denies that she posed a threat to her own safety or to Defendant Alvarado's safety. (*Id.* at ¶ 78). Plaintiff does not dispute that she slipped her hand out of the handcuff. (*Id.* at ¶ 80). However, Plaintiff claims that Defendant Alvarado never returned her walker to her. (*Id.*). Instead, she found it lying on the ground outside the bus gates. (*Id.*). Plaintiff called the 911 operator from outside the bus station, claiming that she was a disabled person and had just been attacked. (*Id.* at

¶ 59). The 911 operator terminated the call after determining that there was an officer present and called NFTA dispatch. (*Id.* at ¶ 85). Plaintiff called the 911 operator a second time. (*Id.*). At that time, the 911 operator dispatched the Buffalo Police. (*Id.*).

Defendant Alvarado claims that he received a call from NFTA dispatch that there was a woman in front of the bus station with the Buffalo Police Department claiming she was robbed or that money was taken from her. (Dkt. 54 at ¶ 85). He informed dispatch that the Buffalo Police should handle the matter because he "was obviously not getting through to the Plaintiff." (*Id.* at ¶ 87). Defendant Alvarado observed the Buffalo Police speaking to Plaintiff and then saw the Buffalo Police drive away. (*Id.* at ¶ 88).

Plaintiff alleges that the Buffalo Police Officer told her that NFTA had authority over the situation, and she needed to call 911 again, at which time the Buffalo Police Officer called 911 and explained the situation to the 911 operator. (Dkt. 59 at ¶ 88). According to Plaintiff, she then spoke with two senior NFTA police officers, one of whom gave her a piece of paper on which he had written a badge number and a telephone number. (*Id.*). These officers called for an ambulance, and Plaintiff was transported to Buffalo General Hospital's Emergency Department. (*Id.*).

As a result of this incident, Plaintiff suffered bruising. (Dkt. 54 at ¶ 93; Dkt. 59 at ¶ 93). Plaintiff also claims that she "has continued to suffer physical, psychological and emotional effects of Defendant's assault to the present day." (Dkt. 59 at ¶ 96).

Prior to this incident, Defendant Alvarado was never investigated for misconduct relating to excessive force, false arrest, racial insensitivity, or dishonesty and lying. (Dkt. 54 at ¶ 97; Dkt. 59 at ¶ 97). Michael Garrity, Captain of Investigative

Services at NFTA, has confirmed that he had supervisory authority over Defendant Alvarado, and that Defendant Alvarado participated in numerous training sessions throughout his career as a Transit Police Officer. (Dkt. 54 at ¶ 98; Dkt. 59 at ¶ 98). Before September 22, 2008, Defendant Alvarado had no prior history of, or prior complaint against him related to, an excessive use of force or unlawful detention, nor did he have any prior history or prior complaint related to discrimination or harassment based on race, gender, age, disability, and/or national origin. (Dkt. 54 at ¶ 101; Dkt. 59 at ¶ 101).

## DISCUSSION

### I. Standard on Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts. ... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec.*, 475 U.S. at 586–87, 106 S.Ct. 1348) (emphasis in original). "[T]he mere existence

of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

### II. Defendant Alvarado

Plaintiff's first cause of action is asserted against Defendant Alvarado pursuant to 42 U.S.C. § 1983, for excessive use of force and unlawful seizure/detention. (Dkt. 6 at 4).

Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Despite these protections, "[n]ot every state law tort becomes an actionable constitutional tort under section 1983 because it was committed by a state actor. Thus, our initial inquiry is whether the alleged actions, if taken as true, deprived [the plaintiff] of a constitutional right." *Bisignano v. Harrison Cent. Sch. Dist.*, 113 F.Supp.2d 591, 595–96 (S.D.N.Y.2000). To establish a claim under Section 1983, a plaintiff must demonstrate that the challenged conduct was "committed by a person acting under color of state law," and "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d

Cir.1994). Defendant Alvarado does not dispute that he was acting under color of state law, but he does dispute that his actions violated Plaintiff's constitutional rights. (Dkt. 55 at 8-13). As discussed below, the Court finds that there are disputed issues of material fact as to the reasonableness of Defendant Alvarado's use of force against and seizure of Plaintiff.

## A. Excessive Use of Force

■ Defendants contend that Defendant Alvarado's decision to escort Plaintiff from the bus was reasonable, and that the physical contact he used to remove her from the bus was *de minimis*. (Dkt. 55 at 9). Defendants argue that the officer was permitted to "briefly detain and handcuff Plaintiff due to concerns for her safety, his safety or the safety of others" as a matter of law. (Dkt. 55 at 10).

Plaintiff counters that Defendant Alvarado did not act in a reasonable manner, stating "the force he used—in throwing the Plaintiff's walker out of the bus, dragging the Plaintiff down the steps using a 'pain compliance hold,' forcing her into the police substation under threat of arrest, shaking her, striking her repeatedly, then handcuffing her to a chair—far exceeded the amount of force that was necessary under the circumstances." (Dkt. 64 at 14).

■ An officer's use of force violates the Fourth Amendment "if it is objectively unreasonable in light of the facts and circumstances confronting the officer, without regard to the officer's underlying intent or motivation." *Piper v. City of Elmira*, 12 F.Supp.3d 577, 588 (W.D.N.Y.2014) (quotation omitted). Indeed, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. 1865. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

■ "There may be certain circumstances where the alleged unconstitutional act and injury are so *de minimis* that they cannot constitute a constitutional violation as a matter of law." *Breitkopf v. Gentile*, 41 F.Supp.3d 220, 242–43 (E.D.N.Y.2014). By contrast, even where the only physical injuries alleged are bruises, if they are sustained following an unjustified use of force, the claims of excessive use of force will survive a summary judgment motion. *See Hayes v. N.Y.C. Police Dep't*, 212 Fed. Appx. 60, 62 (2d Cir.2007) ("[W]e have permitted claims to survive summary judgment where the only injury alleged is bruising."); *see also Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir.2004) ("we have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising."). This is because, "[u]nder the law, police are not permitted to use any degree of force in all instances—in some circumstances, no use of force is reasonable because none is required." *Weather v. City of Mount Vernon*, No. 08 Civ. 192 (RPP), 2011 WL 1046165, at *11 (S.D.N.Y. Mar. 22, 2011), *aff'd*, 474 Fed. Appx. 821 (2d Cir.2012)). Not only does Plaintiff allege that she suffered bruising as a result of Defendant Alvarado's actions, but she also claims "injuries to her right arm and shoulder that persist to the

present day, nightmares, depression, anxiety, a distrust of the police, and fear of taking the bus." (Dkt. 64 at 11). Based on these allegations, Plaintiff has alleged more than *de minimis* injuries from her interaction with Defendant Alvarado.

Here, if a jury credits Plaintiff's version of events, Plaintiff was fully cooperative when Defendant Alvarado physically removed her from the bus in a pain compliance hold, hit her multiple times, and handcuffed her to a bench. This use of force would not be objectively reasonable in response to a cooperating citizen. Per Plaintiff's version of events, any physical use of force would be objectively unreasonable. In light of the competing versions of events, there is an outstanding question of material fact with respect to Plaintiff's excessive use of force claims against Defendant Alvarado.

### B. Unlawful Seizure/Detention

Defendants contend that Plaintiff's removal from the bus is not actionable as a Fourth Amendment seizure. (Dkt. 55 at 10). They argue that a "brief temporary detention is not an unlawful arrest." (*Id.* at 9).

"In order to determine whether an individual's Fourth Amendment rights have been violated, the Court must engage in a two-part analysis: (1) considering all of the circumstances of the case, was there a 'seizure' within the meaning of the Fourth Amendment; and (2) if there was a seizure, was such seizure reasonable." *Gross v. City of Albany*, No. 1:14–CV–0736 (LEK/TWD), 2015 WL 5708445, at *5 (N.D.N.Y. Sept. 29, 2015). A "[p]erson has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

*United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

The Second Circuit Court of Appeals has recently explained:

> Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc. A person may feel obliged to obey such an order. Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure order. Our precedent does not view such police conduct, *without more*, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes.

*Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir.2015) (emphasis added). Under the circumstances of that case, the court found that where the officer's method of removal was not "simply to order or escort [the plaintiff] from the courthouse, or use guiding force to direct him as needed," but rather, involved the decision to "physically grab [the plaintiff] without encountering reprisal or resistance, and to use painful force to control [the plaintiff's] movements," that was sufficient to at least allege a Fourth Amendment seizure. *Id.* at 254.

Here, there are disputed issues of fact as to whether a seizure within the meaning of the Fourth Amendment occurred. Plaintiff was physically removed from the bus and handcuffed to a bench. Although Defendant Alvarado was, by his version of events, merely using guiding force to escort Plaintiff from the bus, he does acknowledge that he handcuffed Plaintiff to a bench. (Dkt. 54 at 44:18-23; 45:1). Under such circumstances, the jury could conclude that a reasonable person would not have believed that she was free to leave,

and as a result, a seizure occurred. *Compare Louis v. Metro. Transit Auth.*, No. 12–CV–6333 (ILG)(JO), 145 F.Supp.3d 215, 228, 2015 WL 6814739, at *9 (E.D.N.Y. Nov. 6, 2015) ("Although Plaintiff was ejected from the bus, she was 'free to go anywhere else,' and Defendants did not restrain her. Therefore, there was no seizure.") (quoting *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir.1994)).

■ In addition, there is a question of fact as to whether the seizure was reasonable. Defendant Alvarado claims that Plaintiff's conduct posed a threat to herself and to others, and therefore he elected to handcuff one of Plaintiff's arms to a bench for safety. (Dkt. 54 at 44:18-23; 45:1). He testified that Plaintiff was "argumentative," "irate," and "very loud." (Dkt. 54 at 33:19-20; 35:22-23; 37:13-19; 43:1-18). However, Plaintiff alleges that she was cooperating with Defendant Alvarado and was handcuffed without reason or provocation. (Dkt. 61 at ¶¶ 68-73).

As a result, it is apparent that there are disputed issues of material fact with respect to Plaintiff's claims against Defendant Alvarado alleging an unlawful seizure/detention in violation of the Fourth Amendment.

## C. Qualified Immunity Defense

■ Defendants also argue that, even if there are disputed issues of material fact with respect to Plaintiff's constitutional claims against Defendant Alvarado, he is nonetheless entitled to the protection of the qualified immunity defense and, accordingly, summary judgment is warranted in his favor. (Dkt. 55 at 11-13).

■ "A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir.2001). "A right is considered to be 'clearly established' if 'the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (alteration in original). "The second prong of the qualified immunity analysis permits [the] court to grant summary judgment if a reasonable officer could have believed his or her actions were lawful." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir.2015) (quotation omitted).

■ The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir.2010). "Officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir.2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

"The Supreme Court has ... made it clear that even officers who are found to have used excessive force may be entitled through the qualified immunity doctrine to an extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.'" *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir.2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "The

relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

Here, there is a question of fact as to what the circumstances were that Defendant Alvarado faced when he allegedly used excessive force to seize Plaintiff. Therefore, the Court cannot make a determination as to what a reasonable officer would have believed was reasonable in light of the circumstances. Accordingly, Defendants' request to dismiss Plaintiff's claims against Defendant Alvarado based on the doctrine of qualified immunity is denied.

## III. Defendant NFTA

Plaintiff's second cause of action is asserted as against NFTA pursuant to "42 USC 1983 and Monell." (Dkt. 6 at 4).[1] Specifically, Plaintiff alleges NFTA:

> Maintained policies, practices, customs, and procedures of permitting NFTA officers to use excessive, unnecessary, unlawful force against NFTA customers, failing adequately to train, discipline, supervise, or to maintain adequate policies and procedures to prevent excessive uses of force against NFTA customers, failing to react to known prior, similar incidents in which excessive force was used, including prior citizen complaints and settlements, which failures were a cause of the use of excessive force against Plaintiff.

(*Id.*). Defendants argue that Plaintiff has failed to substantiate her claim against NFTA because she has failed to submit any evidence that NFTA has a "custom or practice of tolerating police abuse or of failing to discipline and supervise alleged

lawbreaking police officers." (Dkt. 55 at 6). Further, Defendants argue that Plaintiff cannot establish that NFTA has a deficient training program that led to a constitutional violation. (*Id.* at 7).

"Municipalities are not subject to § 1983 liability on the basis of a *respondeat superior* theory." *Lin v. Cnty. of Monroe*, 66 F.Supp.3d 341, 351 (W.D.N.Y. 2014) (quotation omitted). In order to maintain a § 1983 action against a municipal defendant, a plaintiff must identify a municipal policy or custom from which the alleged injury arose. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A city's "failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of New York,* 490 F.3d 189, 195 (2d Cir. 2007). "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir.2006) (emphasis in original).

"In addition, a policy, custom, or practice of the entity may be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Breitkopf v. Gentile*, 41 F.Supp.3d 220, 253–58 (E.D.N.Y. 2014) (quotation omitted). "To establish deliberate indifference, a plaintiff must show that: [1] the policymaker knows to a moral

---

1. To the extent Defendants argue that Plaintiff's allegations of a "hate crime" and discrimination should be dismissed (Dkt. 55 at 13-14), these claims were already addressed and rejected by the Court by Decision and Order dated May 10, 2012 (Dkt. 8 at 2 n.3, 7 n.5), and need not be further addressed at this time.

certainty that [its] employees will confront a particular situation; [2] the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the situation; and [3] the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Wray v. City of New York*, 490 F.3d 189, 195–96 (2d Cir.2007) (quotations omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011). A plaintiff's own, unsubstantiated allegations of a municipal policy is insufficient to sustain a claim at the summary judgment stage. *See Jackson v. Cnty. of Nassau*, No. 07–CV–245 (JFB) (AKT), 2010 WL 1849262, at *35–36 (E.D.N.Y. May 6, 2010) (granting summary judgment in favor of county on plaintiff's *Monell* claim, because the "mere assertion that a municipality has such a policy is insufficient to establish *Monell* liability," and "in any case Plaintiff may not overcome summary judgment by relying merely on allegations or denials in its own pleading.").

Here, Plaintiff bases her *Monell* claim on the argument that NFTA failed to properly train its employees to complete TP-98—Use of Physical Force Forms ("TP-98 forms") in accordance with its use of force policy and did not enforce the requirement to complete the forms, thereby creating a policy of tolerance for unjustified uses of force.

Defendant NFTA's use of force policy describes the use of force continuum in relevant part as follows:

A. Cooperative

The suspect generally complies with the command of the Officer and offers no resistance. In this instance, the use of force is not authorized.

B. Active Resistance

The subject makes physically evasive movements to defeat an Officer's attempt at control (e.g. bracing, tensing, moving away) OR verbally threatens imminent harm to the Officer or another person OR verbally signals an intention not to be taken into or retained in custody, providing the subject's intent to physically resist is clear. The Officer is authorized to physically restrain and take control of the subject by grabbing, holding, forcibly handcuffing, and/or using pain compliance hold and/or chemical agent on the subject.

(Dkt. 54 at 211). The policy then explains that an officer "shall prepare a TP-98—Use of Physical Force Report" whenever that officer applies "any level of physical force" as defined in, *inter alia*, the "active resistance" portion of the use of force continuum. (*Id.* at 213).

According to Plaintiff, there is evidence in the record sufficient to demonstrate NFTA's policy of not requiring a TP-98 form to be completed when excessive force is utilized, and this is sufficient to create an issue of fact with respect to NFTA's *Monell* liability. Specifically, Plaintiff relies upon Defendant Alvarado's failure to prepare a TP-98 in connection this incident, the alleged failure to complete the TP-98 form in eleven other incidents, and alleged admissions by Captain Garrity that the policy was not followed when handcuffs were applied. As discussed below, none of this purported evidence relied upon by Plaintiff is sufficient to raise an issue of material fact justifying the denial of summary judgment in favor of NFTA, and moreover, even if there was evidence of a custom of failing to consistently require the completion of the TP-98 form when warranted, Plaintiff has failed to raise an

issue of material fact with respect to a causal link between this alleged policy or custom and the alleged constitutional deprivations at issue in this case.

### A. Defendant Alvarado's Failure to Complete a TP-98 Form

██ Plaintiff asserts that Defendant Alvarado's "use of force clearly violates Defendant NFTA's policy." (Dkt. 64 at 15). She claims that pursuant to NFTA's use of force policy, Defendant Alvarado was not permitted to use any physical force against Plaintiff, and that once he did, he was required to comply with the reporting requirements of the Policy. (*Id.* at 22-23). Plaintiff argues that this failure to complete a TP-98 form is representative of NFTA's policy or custom of never requiring an officer to complete a use of force form when handcuffing an individual.

██ It is well-settled that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal liability." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir.1998). To establish liability under *Monell*, a plaintiff must demonstrate that the conduct of the officers was "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011). Therefore, while there is a question of fact as to whether the circumstances of the instant case presented "active resistance" or "forcibly handcuffing" Plaintiff, requiring Defendant Alvarado to complete a TP-98 form, this single incident is insufficient to establish a custom or policy for Defendant NFTA's *Monell* liability.

### B. Custom or Practice based on Eleven Other Incidents

██ In an effort to establish NFTA's persistent and widespread custom of toler-

ating universal violations of its use of force policy by officers, Plaintiff points to eleven incidents prior to September 22, 2008, wherein complaints of excessive force against NFTA officers were made by members of the public, and asserts that only seven of the files contain documentation indicating that force was used, and that none of the files contain all of the documentation required by NFTA's use of force policy. (Dkt. 64 at 17). Plaintiff claims that "[b]y systematically failing to enforce the reporting requirement of that policy, Transit Authority Police Management have created a situation that enables NFTA Management to maintain complete ignorance of any abuses of the Use of Physical Force policy by NFTA Police Officers thereby tacitly permitting and condoning the unconstitutional practices and customs alleged by the Plaintiff in her Complaint." (*Id.* at 21). Further, Plaintiff asserts that "Defendant NFTA created and condoned a climate and custom of permitting NFTA police officers to use excessive, unnecessary, and unlawful force against NFTA customers without fear of repercussions." (*Id.* at 22).

Defendants argue that this is a misrepresentation of the policies of NFTA. Defendants counter that TP-98 forms are completed "contemporaneously with the event, arrest, incident, etc. if triggered by the requirements contained in the Use of Force policy." (Dkt. 67 at 5-6). Therefore, Defendants explain, if an NFTA customer subsequently files a notice of claim or makes an accusation, there would be no retroactive requirement to complete use of force forms. (*Id.* at 6). Further, Captain Garrity testified that he could only identify a few incidents, in the entire history of thousands of arrests by NFTA officers, where a TP-98 form should have been completed but could not be located. (Dkt. 69 at ¶¶ 6, 9-11). According to Captain

Garrity, NFTA's Transit Police made 808 arrests in 2006, 839 arrests in 2007, and 748 arrests in 2008. (*Id.* at ¶ 10). Of the seven incidents identified by Plaintiff's counsel of an arrest involving uses of force, Captain Garrity states that only three required and were missing TP-98 forms. (*Id.* at ¶ 6).

Thus, the record plainly establishes a large volume of arrests and a comparably minor number of files missing TP-98 forms. This evidence remains unchallenged by Plaintiff. The few files missing TP-98 forms that have been identified by Plaintiff hardly demonstrate a widespread policy of failing to report uses of force as required by NFTA's use of force policy.

### C. Captain Garrity's Alleged Admissions about the Failure to Complete TP-98 Form When Handcuffing

■ In his February 29, 2016 Reply Affidavit, Captain Garrity explains:

Specifically, with respect to handcuffing, we have never interpreted our Use of Force policy to require our officers to complete a TP-98 every time a suspect or offender is handcuffed. It is not the custom or practice of the department, nor have we trained our officers to do so. This is unlike a situation where a chemical spray is used, whether intentionally or accidentally. The Use of Force Policy requires our officers to complete a TP-98 any time a chemical agent is discharged. This is the custom and practice of the department and what we require of and train our officers to do.

(Dkt. 69 at ¶ 5).

Plaintiff interprets this statement by Captain Garrity to indicate that NFTA maintains a policy of never requiring officers to complete TP-98 reports after applying handcuffs. As a result, according to Plaintiff's reasoning, if an officer inappropriately used force when applying handcuffs, no report of the incident would be filed. Plaintiff offers this "admission" as evidence of a custom or policy of NFTA to permit officers to use force in handcuffing citizens without fear of repercussion.

Defendants posit, and the Court agrees, that Captain Garrity was not suggesting that officers were never required to complete use of form reports after using handcuffs, but was merely explaining that every use of handcuffs did not require the completion of a TP-98 form. The use of force continuum as outlined in NFTA's use of force policy states that "forcibly handcuffing" an individual falls under the appropriate response to "active resistance" and requires the completion of a TP-98 form. (Dkt. 54 at 211, 213). Per Captain Garrity's statement, handcuffing an individual, short of "forcibly handcuffing" that individual, would not require the completion of a TP-98 form.

Put simply, Plaintiff has failed to demonstrate a disputed issue of material fact as to the existence of a custom or policy of tolerating the failure of NFTA Transit Officers to report excessive uses of force.

### D. Causal Link

■ Even if Plaintiff had established that NFTA maintained a custom of failing to require officers to complete a TP-98 form every time they applied handcuffs, Plaintiff has failed to demonstrate this alleged custom actually caused the violation of Plaintiff's rights on September 22, 2008.

■ "[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103

L.Ed.2d 412 (1994). Plaintiff has provided no more than sheer speculation that Defendant Alvarado and other NFTA Transit Officers understood there was a policy or custom of permitting officers to use excessive force, including the forcible use of handcuffs, without requiring the reporting of this use of force or forcible use of handcuffs, thereby causing Defendant Alvarado to use excessive force against Plaintiff without fear of repercussion. *See Mayes v. Village of Hoosick Falls*, No. 1:13-CV-370 (NAM/CFH), 162 F.Supp.3d 67, 96 n. 12, 2016 WL 593628, at *22 n. 12 (N.D.N.Y. Feb. 12, 2016) ("Plaintiffs do not specify or produce evidence of any failure to train or inappropriate policy leading to any particular unconstitutional conduct and thus cannot make out a direct causal link between the alleged municipal failing and any constitutional deprivation."); *Carvalho v. City of New York*, No. 13-cv-4174 (KPKC)(MHD), 2016 WL 1274575, at *21 (S.D.N.Y. Mar. 31, 2016) (where plaintiffs alleged failure to train but showed no evidence of the city's deliberate indifference toward its officers' treatment of citizens or a pattern or practice of untrained officers using excessive force, there was no causal link to support a *Monell* claim); *Miller v. City of New London*, No. 3:13-cv-619 (VAB), 2015 WL 2240269, at *9 (D.Conn. May 12, 2015) (dismissing plaintiff's *Monell* claim for failing to present facts "establishing a causal link between the alleged problems with use-of-force reporting and [the plaintiff's] alleged constitutional injuries."); *Usavage v. Port Auth. of New York & New Jersey*, 932 F.Supp.2d 575, 601 (S.D.N.Y.2013) (finding the plaintiff's argument that the municipal defendant's policy of allowing internal investigators to determine which footage to share and delete allowed police officers to engage in excessive use of force without fear of being recorded and thus led to the alleged excessive use of force against the plaintiff was

"extraordinarily attenuated—so attenuated that, in the relevance sense of the term, PATH'S policy of preserving video footage cannot be said to have caused the alleged excessive use of force."). In the absence of any showing of a custom or practice as well as a direct causal link between that custom or practice and the alleged violation of Plaintiff's constitutional rights, NFTA's *Monell* liability cannot be established as a matter of law and Defendant's motion for summary judgment as to Plaintiff's claims against Defendant NFTA is granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 53) is granted in part and denied in part. The Clerk of Court is directed to terminate Defendant NFTA from the caption of this case. The Court will schedule a trial date for Plaintiff's remaining claims against Defendant Alvarado.

SO ORDERED.